ALLIANCE WALL CORPORATION, APPELLEE, *v.* AMPAT MIDWEST CORPORATION, APPELLANT.

---

(No. 47280—Decided May 28, 1984.)

*Stanley Stein* and *Alvin I. Gilmore,* for appellee.

*Lucien R. Marino,* for appellant.

JACKSON, P.J. This is an appeal from a judgment of the Cleveland Municipal Court, following a nonjury trial, which awarded damages to appellee, Alliance Wall Corporation, in the amount of $9,639.76, and denied the counterclaim of appellant, Ampat Midwest Corporation.

The parties entered into a contract whereby Alliance Wall Corp. ("seller") agreed to sell, and Ampat Midwest Corp. ("buyer") agreed to buy, over two hundred aluminum panels.

There was no formal written contract between the parties. The companies did exchange a series of form purchase orders and acknowledgments prior to performance.

Ampat (buyer) sent its first purchase order in March 1978, consisting merely of a list of sizes and numbers of panels which would be ordered. This form was acknowledged by Alliance Wall (seller) in August 1978. It was noted "hold for final sizes," and the price was listed as $29,217.

On January 26, 1981, buyer sent a second purchase order listing a number of panels, again stating "final sizes to be provided after approval of Midwest Architectural Metal shop drawings and your color samples." The purchase order also states "ship all materials within five (5) weeks of release for production." Delivery instructions were to ship "your [Alliance] truck," "FOB Okmulgee, Oklahoma." The contract price is stated to be $38,847.

Seller acknowledged this purchase order by letter dated January 29, 1981. The letter states: "We are placing your order in our 'to be scheduled' file until we are in receipt of the final sizes and quantities." It adds, "Please keep in mind that our tentative shipping schedule is approximately five to six weeks after the final information is received." Price is not mentioned.

By way of letter dated September 1, 1981, buyer irrevocably committed itself to ordering the aluminum panels from Alliance. The letter alters both the requested delivery date and the price. It states, in relevant part:

"Shipment should occur as soon as possible and certainly within seven (7) weeks of the date of this release. Please note that the order originally required a five (5) week production period but we have expanded that based on information from Andy Pappalardo.

"* * *

"The total square footage on the order has been reduced from 3,692 square feet to 3,284 square feet. We assume that the price of the order will be reduced proportionally. That would result in a reduction of eleven (11%) per

cent so that the amount of the order would be $34,574.00. Please comment."

The response to this was an acknowledgment, dated September 22, 1981, giving the price as $36,712.01, and providing that the "tentative shipping date" was to be November 6, 1981. The acknowledgment again noted that the goods were to be shipped F.O.B. Okmulgee, Oklahoma, which is the site of the seller's plant.

On October 22, 1981, seller received the following letter from buyer, dated October 14, 1981:

"Subject order was released September 1, 1981 based on your guaranteed delivery schedule of five weeks A.R.O.

"Since then, we have had two revised shipping dates, the latest being November 20, 1981. This is *not* acceptable! We must demand better service.

"Our customer, A.M. Higley Company, has informed us that they are being forced to put in temporary enclosures due to our failure to meet our (your) commitment and charge us accordingly.

"This letter is your notice that all back charges caused by your delivery failure will be passed on to you.

"I expect an immediate reply to this letter."

Buyer received an immediate reply from seller. The following mailgram, dated October 22, was entered into evidence.

"We are in receipt of your letter dated 10-14-81. The fact that you are threatening the Alliance Wall Corp. with backcharges which we will not accept under any condition has put us in the unenviable position of requiring a written revocation of those threats and acknowledgment of our standard terms and conditions of sale or we will cancel our order for the required aluminum [sic] and allow you to purchase the required material from another supplier. Please note that on 10-5-81 our L. Brick-

ell advised your J. Mason of the tentative shipping schedule of 11-20-81.

"We very frankly are exerting all possible pressure on our supplier to speed up their delivery of the aluminium [sic] and our plant personnel has been alerted to the urgency of your order. However, we cannot and will not work under threat of backcharges for which we do not have total control.

"We await your reply, please respond by telephone no later than 10-23-81 and follow up with the necessary written correspondence."

The goods were shipped November 20, 1981, and were received November 23, 1981. Twenty-six days later, on December 18, 1981, buyer sent seller a letter notifying seller of defects in one packet of the goods, and referring to the fact that oral notice of the defects had been given the previous day. The letter states, in part:

"This note is confirmation of our telephone conversation of December 17, 1981 in which we advised you of a potential 'out of flatness' problem."

Ultimately forty-five panels were found to be defective. Some were corrected by buyer, some by seller. Buyer paid agreed damages of $3,000 to its general contractor for its delay in installing the aluminum panels. Buyer also incurred several thousand dollars of expenses in repairing the panels, and in renting equipment to install them over a period of several months. Buyer apparently did not pay to seller the full contract price. The exact amount paid by the buyer was not entered into evidence below, nor does either party contend that the trial court erred in determining the contract price of the goods. Accordingly, the issue of the exact amount of damages owed to the seller is not before this court of appeals. Appellant buyer assigns only two errors for review.[1]

---

[1] Assignment of Error No. 1:

"The trial court erred in finding that the

## I

Appellant contends for its first assigned error that the court erred in finding that the "delivery period" was modified from October 14, 1981 to November 20, 1981.

At issue, of course, was not the date of delivery, but the date of shipment. The goods were to be shipped F.O.B. seller's plant. This was a shipment contract. R.C. 1302.32(A).[2] The seller was required only to place the goods in the possession of a carrier, make a reasonable contract for shipment, tender documents of title, and notify the buyer of the shipment. R.C. 1302.48.[3]

The parties did not agree in their correspondence to a shipment date, nor is there persuasive evidence that the parties orally agreed upon a definite shipment date. Seller's vice-president at trial admitted that seller was aware of buyer's urgent need for prompt shipment. This fact, in conjunction with buyer's statement in its letter of September 1, 1981, that shipment should "certainly" occur within seven weeks, is persuasive evidence that the

parties had agreed that "time was of the essence." It was a crucial term of the contract. Nevertheless, the seller did not expressly agree to the shipment date of seven weeks, but instead proposed a "tentative shipping date" of November 6, 1981.

Seller's agent explained that in contracts of this type, it could not guarantee a shipping date because it depended for raw materials upon a Minnesota supplier. It could not fabricate the aluminum panels without those materials.

In the case at bar there was testimony that toward the end of September, the seller learned that its supplier would deliver the aluminum two weeks behind schedule. The seller promptly notified the buyer that this would delay shipment from November 6 to November 20, 1981. There was also testimony that after the exchange of letters on October 14 and October 22, 1981, the buyer orally agreed to the new delivery date, and promised not to hold seller liable for damages resulting from this delay. The

---

parties agreed to alter the original delivery period from seven (7) weeks (9-1-81 to 10-14-81) to eleven and one half (11½) weeks (9-1-81 to 11-20-81)."

Assignment of Error No. 2:

"The trial court erred in finding that appellant failed (1) to inspect the appellee's goods within a reasonable time after delivery to discover defects and (2) to notify appellee of the defects within a reasonable time."

[2] "Unless otherwise agreed the term F.O.B. (which means 'free on board') at a named place, even though used only in connection with the stated price, is a delivery term under which:

"(1) when the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in section 1302.48 of the Revised Code and bear the expense and risk of putting them into the possession of the carrier * * *." R.C. 1302.32(A)(1).

[3] "Where the seller is required or authorized to send the goods to the buyer and the contract does not require him to deliver them at a particular destination, then unless otherwise agreed he must:

"(A) put the goods in the possession of such a carrier and make such a contract for their transportation as may be reasonable having regard to the nature of the goods and other circumstances of the case; and

"(B) obtain and promptly deliver or tender in due form any document necessary to enable the buyer to obtain possession of the goods or otherwise required by the agreement or by usage of trade; and

"(C) promptly notify the buyer of the shipment.

"Failure to notify the buyer under division (C) of this section or to make a proper contract under division (A) of this section is a ground for rejection only if material delay or loss ensues." R.C. 1302.48.

buyer offered no evidence to rebut this testimony.

The parties did not agree, in their confirmatory memoranda, to a shipment date. The shipment date was a "material term"; in fact, it appears to have been more important to the buyer than was the exact price, because of its need to promptly complete the work. The seller appeared to be just as adamant not to be bound to any particular date.

The parties' failure to reach an agreement on the matter of the shipment date and price prevented the formation of a binding contract. The buyer had proposed a date of seven weeks from September 1, 1981; to-wit, October 19, 1981. The seller had "tentatively" offered to ship on November 6, 1981. In short, the seller did not agree to be bound by any particular date of shipment.

In the usual case, the seller's written confirmation "operates as an acceptance even though it states terms additional or different from those offered * * *." R.C. 1302.10(A).[4] In such cases the material terms of the contract are the buyer's terms. This rule, however, does not apply where the parties disagree as to "dickered for" terms. In such a case, contract formation does not occur until both sides have at least partially performed.[5] Here, the goods were shipped and received, and the price was partially paid. This was conduct by both parties sufficient to establish a contract.

---

[4] "(A) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance *even though it states terms additional or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.*

"(B) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

"(1) the offer expressly limits acceptance to the terms of the offer;

"(2) they materially alter it; or

"(3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

"(C) *Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract.* In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of Chapters 1301., 1302., 1303., 1304., 1305., 1306., 1307., 1308., and 1309. of the Revised Code." R.C. 1302.10 (emphasis added).

[5] White & Summers, Uniform Commercial Code (2 Ed. 1980) 37, Section 1-2, states:

"Not all return documents are 2-207(1) 'acceptances.' If the return document diverges significantly as to a dickered term, it cannot be a 2-207(1) acceptance. For example, if the purchase order calls for the sale of 200,000 pounds of lard at ten cents a pound and the acknowledgment responds with 200,000 pounds at fifteen cents a pound, the second document is not an acceptance under 2-207(1), and no contract is formed via the exchange of forms. If the parties thereafter fall into dispute before either performs, no one has liability for not performing. For example, the parties in *Koehring Co.* v. *Glowacki* exchanged telegrams, one with the sale 'as is-where is,' the other 'F.O.B. our truck your plant loaded.' The parties never began performing and the court held that no contract was formed since the second form diverged 'radically.'

"If, on the other hand, the parties perform and the question arises as to what the contract is, we would proceed directly to subsection (3). There, as we have seen, the parties will get the terms on which their documents agree plus those that the Code offers." (Footnotes omitted.)

The cited case may be found at (1977), 77 Wis. 2d 497, 253 N.W. 2d 64, 21 U.C.C. Rep. 715. Section 2-207(1) of the Uniform Commercial Code is codified at R.C. 1302.10(A).

Therefore, under R.C. 1302.10(C),[6] the terms of the contract consist of the terms upon which the parties agreed together with the "gap-filler" provisions of the Uniform Commercial Code.

The relevant "gap-filler" for purposes of this appeal is the time for shipment. In the absence of an agreed-upon time for delivery, the code prescribes that it shall be a "reasonable time." R.C. 1302.22(A).[7] As of the time of the formation of the contract, a reasonable time under the circumstances was within a reasonable time after the seller was able to obtain its raw materials. This was November 20, 1981, the actual date of shipment.

The first assigned error is not well-taken.[8]

## II

For its second assigned error, appellant contends that the court erred in ruling that it did not give the seller timely notice of defects in the goods.

The buyer must reject goods "within a reasonable time after their delivery or tender." R.C. 1302.61(A).[9] If the buyer does not reject the goods in a timely fashion, it is considered to have accepted them. R.C. 1302.64(A)(2).[10] The period of time in which the buyer must act is measured by the buyer's right to a reasonable opportunity to inspect the goods. R.C. 1302.64.[11]

Here, the buyer did not notify the seller of any defects for twenty-five days. With the evidence in this posture, this court is not persuaded that the trial court abused its discretion in finding that the buyer was tardy in asserting its right to reject the goods.

Once the goods were accepted, this did not defeat the buyer's right to sue for breach. However, "[t]he burden is on the buyer to establish any breach with respect to the goods accepted." R.C. 1302.65(D). It was not disputed that forty-five of the panels were defective. However, the seller's representative

---

[6] See footnote 4, *supra,* for text of R.C. 1302.10.

[7] "The time for shipment or delivery or any other action under a contract if not provided in sections 1302.01 to 1302.98, inclusive, of the Revised Code or agreed upon shall be a reasonable time." R.C. 1302.22(A).

[8] Having disposed of this matter by determining that the contract was not formed until performance had occurred, it is unnecessary for this court to consider whether the seller's shortage of raw materials was a contingency "the non-occurrence of which was a basic assumption on which the contract was made," R.C. 1302.73(A), thus excusing its delay. We note, however, that it was the seller's unwillingness to assume the risk of a firm shipping date which prevented the formation of a binding contract until partial performance had occurred. Also not considered is, if the change in shipping date were treated as a contractual modification, would this be valid under R.C. 1302.12(C) and 1302.04 (Statute of Frauds).

[9] "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." R.C. 1302.61(A).

[10] "(A) Acceptance of goods occurs when the buyer:

"(1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

"(2) fails to make an effective rejection as provided in division (A) of section 1302.61 of the Revised Code, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

"(3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

"(B) Acceptance of a part of any commercial unit is acceptance of that entire unit." R.C. 1302.64.

[11] See footnote 10, *supra,* for text of R.C. 1302.64.

testified that he had been unable to determine whether the panels were damaged in the manufacturing process (when risk of loss would be on the seller) or in transit (when risk of loss would be on the buyer). R.C. 1302.53(A)(1).[12] The buyer presented no persuasive evidence that the seller had been at fault. Since the buyer carried the burden of proving that the goods were damaged at the fault of the seller or while risk of loss was on the seller, its counterclaim for damages must fail.

The second assigned error is also not well-taken.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

NAHRA and PRYATEL, JJ., concur.

---

[12] "Where the contract requires or authorizes the seller to ship the goods by carrier:

"(1) if it does not require him to deliver them at a particular destination, the risk of loss passes to the buyer when the goods are duly delivered to the carrier even though the shipment is under reservation as provided in section 1302.49 of the Revised Code * * *."

R.C. 1302.53(A)(1).