**ENERGY MARKETING SERVICES, INC., Plaintiff,**

v.

**HOMER LAUGHLIN CHINA CO., Defendant.**

No. 97CV00864.

United States District Court, S.D. Ohio, Eastern Division.

May 10, 1999.

John Paul Brody, Kegler, Brown, Hill & Ritter, Columbus, OH, for plaintiff.

Stephen Charles Fitch, Chester, Willcox & Saxbe, Columbus, OH, for defendant.

## *OPINION*

MARBLEY, District Judge.

### I. BACKGROUND

On July 3, 1997, Plaintiff Energy Marketing Services, Inc. ("EMS"), filed this action against Defendant Homer Laughlin China Company ("HLCC") in the Franklin County Court of Common Pleas, alleging breach of contract and seeking specific performance under the terms of the parties' prior contract. On July 31, 1997, HLCC removed the case to this Court pursuant to the Court's diversity jurisdiction under 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1441(a). This case was tried, without a jury, from December 22, 1998, to December 23, 1998. At the close of evidence the parties filed post-trial briefs rather than making in-court closing arguments. Pursuant to FED. R.CIV.P. 52(a) and 58, upon consideration of all the evidence and the arguments presented in the record, at trial, and in the post-trial briefs, the Court hereby **Enters Judgment** for HLCC based on the following **Findings of Fact** and **Conclusions of Law.**

### II. FINDINGS OF FACT

On November 5, 1985, Energy Management, Inc., a natural gas supplier and the predecessor in interest to EMS, an Ohio corporation, entered into a Gas Purchase Agreement ("the Agreement" or "the 1985 Agreement") with HLCC, a West Virginia ceramic dinnerware manufacturer, for the sale and purchase of natural gas. The Agreement contained various provisions outlining the terms of the parties' contractual relationship. The relevant provisions of the 1985 Agreement include (1) a "no-modification-unless in-writing" clause stating "no changes, alterations, modifications, additions, or qualifications to the terms of this Agreement shall be effective or binding upon the parties unless made in writing and signed by

*each* of the parties;" (2) a notification of breach clause requiring written notice of the facts relied upon as constituting breach or default under the Agreement; (3) a contract price provision, setting the contract price at $2.49 per dekatherm;[1] (4) a provision of successive one year renewal periods, continuing so long as neither party gave the other sixty days written termination notice in advance of the expiration date; and (5) a provision establishing that Ohio law would govern the performance of the parties under the Agreement.

The parties negotiated several amendments to the 1985 Agreement during the course of their contractual relationship. Albin Strohen, EMS' president, conducted contract negotiations on behalf of EMS; Marcus Aaron, an attorney and president of HLCC, negotiated on behalf of HLCC. On April 1, 1987, by letter signed by both parties, the Agreement was amended to lower the contract price to $2.19/dth for the period from April 1, 1987, through March 31, 1988. On April 5, 1989, by letter signed by both parties, the Agreement was amended to raise the contract price to $2.29/dth for the period from April, 1989, through March 31, 1990. On January 31, 1990, by letter signed by both parties, the Agreement was amended to raise the contract price to $2.31/dth for the period from April 1, 1990, through March 31, 1991.

In November of 1990, Strohen convinced HLCC that the parties should add a last look clause to the 1985 Agreement, *i.e.*, the opportunity for EMS to match the price offered by a third-party supplier in the event HLCC gave notice of termination of the Agreement. Accordingly, on November 12, 1990, by letter signed by both parties, the Agreement was amended to add the last look clause and to lower the contract price to $2.23/dth for the period from November 1, 1990 through October 31, 1991. The last look clause provides:

> In the event that [HLCC] notifies [EMS] of [HLCC's] intent to terminate the Gas Purchase Agreement dated November 5, 1985, pursuant to Article III, Paragraph 1

1. Natural gas is measured in dekatherms, which is abbreviated herein as /dth.

of that same Gas Purchase Agreement, [HLCC] agrees that [EMS] shall have the opportunity to continue the existing Agreement by adjusting its price to match any bona fide offer made to [HLCC] or the lower firm tariff sales price of the local distribution company as the case may be. [HLCC's] written notice of termination to [EMS] shall set forth in detail the price, and price methodology of any offer to provide gas to [HLCC]. If [EMS] agrees, prior to the expiration of sixty (60) days following its receipt of such notice from [HLCC], to match the price of the bona fide third party offer, or, prior to the expiration of thirty (30) days following its receipt of such notice from [HLCC], to match the lower firm tariff sales price of the local distribution company, as the case may be, the Agreement shall continue in full force and effect, subject to the revised contract price. If [EMS] declines to match such offer or lower firm tariff sales price, as the case may be, this Agreement shall terminate.

Thereafter, on April 12, 1991, by letter signed by both parties, the Agreement was amended to lower the contract price to $2.05/dth from April 1, 1991 through October 31, 1992. This amendment specifically referenced the last look clause as a part of, and amendment to, the 1985 Agreement stating:

If acceptable to the [HLCC], this Letter of Agreement will serve as the vehicle to amend the existing Gas Purchase Agreement dated November 5, 1985 between [HLCC] and its facility located in Newell, West Virginia ("Buyer") and [EMS] ("Seller") and the Amendment dated November 12, 1990 to that same Gas Purchase Agreement.

In addition, the April 12, 1991 amendment stated, "all other terms and conditions of the existing Gas Purchase Agreement dated November 5, 1985 and the Amendment dated November 12, 1990 shall remain in full force and effect." By the express language of the April 12, 1991 amendment, the parties considered the last look clause a part of Agreement in 1991.

By September 1992, neither party had given notice of termination and the Agreement automatically renewed pursuant to the successive renewal provision. As the parties continued contract price negotiations, and in compliance with the last look clause, HLCC notified EMS of two bona fide offers from competing natural gas suppliers. The parties engaged in what they characterized as "stressful conversations" concerning the last look clause. HLCC wanted to remove the clause because "such clauses have the effect of lessening the number of competitive bids that end-users receive from other gas marketers or suppliers." Moreover, Aaron maintained that he was misled as to the benefits of the last look clause and that EMS and Strohen did not act in good faith in inducing him to sign the November 1990 amendment adding the clause. Strohen maintained, however, that EMS viewed the clause as an important term of the Agreement which allowed the parties to continue their contractual relationship at a competitive market price. [Strohen, Tr.II–29–31]. EMS also argued that "there is no evidence whatsoever of the anticompetitive effect postulated by HLCC," as shown by the two competitive bids HLCC received in 1992. Ultimately, the parties reached an impasse on whether the last look clause would remain a term of the Agreement.

On September 23, 1992, in a letter sent to HLCC, EMS agreed to match a competitor's bona fide offer, at a fixed price of $2.32/dth. On October 9, 1992, EMS sent a letter to HLCC memorializing the $2.32/dth price match and proposed an amendment to the Agreement requiring HLCC to purchase a minimum quantity of 30,000/dth and no more than a maximum of 40,000/dth per month. As was customary with the parties, EMS' amendment letter requested that HLCC sign and return a copy of the letter to EMS, in compliance with the no-modification-unless-in-writing-clause. On October 13, 1997, in response to EMS' amendment proposal, HLCC sent a letter to EMS—a counterproposal—changing the minimum purchase quantity from 30,000/dth to 20,000/dth per month and deleting the last look clause from the Agreement. Like EMS' proposal, HLCC requested that EMS sign and return a copy of the amendment letter. EMS did not, how-

ever, sign or return HLCC's amendment letter. The parties did not discuss HLCC's counter-proposal amendment or EMS' alleged objection to said amendment, even during a subsequent in-person meeting held on November 17, 1992, concerning a Transportation Service Agreement.[2]

Following the October 1992 exchange of amendment letters, EMS raised the contract price to $2.32/dth and, consistent with HLCC's counter-proposal, did not require HLCC to purchase or to pay for unused natural gas in excess of 20,000/dths per month in the months when usage was less than 30,000/dths. EMS maintains that it was mere happenstance that its conduct coincided with the terms of HLCC's counter-proposal. Conversely, HLCC believed that EMS had accepted the counterproposal and was performing under the terms of the amendment. In addition, HLCC believed that the last look clause was renewable on a year-to-year basis, and because they did not expressly renew the contract, assumed that the clause was removed. Despite this apparent misunderstanding, the parties continued to perform consistent with the terms of the Agreement, without incident or amendment, until 1994.

In August 1994, EMS proposed and HLCC accepted an amendment to extend the Agreement through October 31, 1995, and to raise the contract price to $2.44/dth. In this amendment, signed by both parties, EMS referenced only the 1985 Agreement, whereas the April 12, 1991 amendment specifically referenced both the 1985 Agreement *and* the November, 1990 amendment—which contained the last look provision. Strohen and EMS contend that reference to the November 1990 amendment was not made because they considered the last look clause an integrated part of the 1985 Agreement, and therefore, independent reference was unnecessary. At trial, testimony revealed that Strohen, in drafting the 1994 amendment, directed his administrative assistant to delete any reference to the November 1990 amendment (the last look clause) from the boiler-

plate language used in the parties' prior amendments.

On April 21, 1995, six months prior to the date of expiration, HLCC gave EMS notice of its intention to terminate the Agreement as well as the ancillary Transportation Service Agreement, effective October 31, 1995. Upon receiving HLCC's termination notice, EMS telephoned Aaron to inquire why HLCC was terminating the Agreement. During that conversation EMS informed Aaron that the Transportation Service Agreement required a seven month notice period and, therefore, notice was not timely. Aaron believed that both agreements required only a six month notice period, but assured EMS that HLCC would faithfully perform under the terms of the Transportation Service Agreement until its expiration if notice was not timely. Subsequent review of the Transportation Service Agreement revealed a seven month notice requirement.

At the expiration of the Agreement, on October 31, 1995, HLCC contracted with a third-party natural gas supplier and did not give EMS an opportunity to match the competitor's price. Nonetheless, HLCC was required to perform under the terms of the Transportation Service Agreement until its expiration, *i.e.*, paying a 3% surcharge on the natural gas received from other suppliers, until the Transportation Service Agreement's expiration on October 31, 1996. On July 3, 1997, nearly two years after the expiration of the Agreement, EMS brought this action in the Court of Common Pleas for Franklin County alleging breach of contract for HLCC's failure to provide EMS the opportunity to match the third party natural gas supplier's contract price at the expiration of the Agreement.

### III. CONCLUSIONS OF LAW

■ This action was removed from the state court of Ohio under this Court's diversity jurisdiction, and therefore, this Court applies Ohio substantive law. *See Erie Rail-*

---

**2.** The parties entered into a Transportation Service Agreement on November 17, 1992, providing for the payment of charges to transport natural gas to HLCC. The Transportation Agreement provided that if HLCC received its natural gas

from a third-party supplier other than EMS, HLCC would be required to pay EMS a 3% surcharge on the natural gas from the third-party supplier.

*road Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Jandro v. Ohio Edison Co.,* 167 F.3d 309, 313 (6th Cir.1999). Moreover, by the undisputed terms of the Agreement the parties agreed that the law of Ohio would govern the disposition of the parties' contractual relationship.

■ This is a breach of contract action. In Ohio, the essential elements of a cause of action for breach of contract are: 1) the existence of an enforceable contract; 2) the performance (or excuse from performance) of the contractual obligations by the party seeking relief; 3) breach or failure to fulfill contractual obligations by the other party; and 4) damages suffered by the party seeking relief as a result of the breach. *See Garofalo v. Chicago Title Ins. Co.,* 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (1995); *see also Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations,* 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991). Here, the Agreement and its amendments, constitute an enforceable contract. EMS maintains that HLCC failed to perform its obligations under the last look clause causing economic damages to EMS.

■ In Ohio, the Uniform Commercial Code, as codified by the Ohio Commercial Code, governs contracts for the sale of goods. *See* Ohio Rev.Code § 1302.02. Under the Ohio Commercial Code "a contract for the sale of minerals or the like, including oil and gas, ... is a contract for the sale of goods." Ohio Rev.Code § 1302.03. The contract at issue in this case concerns the sale of natural gas, a good, and therefore must be analyzed under the principles set forth in the Ohio Commercial Code. *See id.*

■ It is axiomatic that a contract is created by an offer and an acceptance resulting in a meeting of the minds of the parties supported by a mutual exchange of appropriate consideration. *See United Liberty Life Ins. Co. v. Ryan,* 985 F.2d 1320, 1332 (6th Cir.1993). "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." 1 Restatement of the Law 2d, Contracts (1981), § 24. An offer is bind-

ing on the offeror when accepted by the offeree. An offer remains open for acceptance by the offeree until it is revoked by the offeror, rejected by the offeree, or until the time for its acceptance has expired. *See id.* at § 36.

■ When an offer is rejected, it ceases to exist, and a subsequent attempted acceptance is inoperative to bind the offeror. *See Garrison v. Daytonian Hotel,* 105 Ohio App.3d 322, 325, 663 N.E.2d 1316 (1995). A rejection is implied in a counteroffer, which is "interpreted as being in effect a statement by the offeree not only that he will enter into the transaction on the terms stated in his counteroffer, but by implication that he will not assent to the terms of the original offer." 1 Williston On Contracts (4 Ed. Lord Ed.1990) 631, § 5:3. An offeree's power to conclude the bargain through his acceptance of the offer is, therefore, terminated by his making of a counteroffer. Restatement, *supra,* § 39(2). Under the Ohio Commercial Code a contract for sale of goods may be made in any manner sufficient to show agreement. *See* Ohio Rev.Code § 1302.07(A).

Revised Code 1302.10 governs the formation of a contract and the terms of such contract when an acceptance differs in terms from an offer. *See McJunkin Corp. v. Mechanicals, Inc.,* 888 F.2d 481, 486 (6th Cir. 1989). Section 1302.10(B) provides:

(B) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(1) the offer expressly limits acceptance to the terms of the offer;

(2) they materially alter it; or

(3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Thus, when a transaction is between merchants, a differing form operates as an acceptance of the contract and the additional terms become part of the contract *unless:* (1) the offer expressly limits acceptance to the original terms; (2) the additional terms materially alter the contract; or (3) notification of objection to the additional terms has

already been given or within a reasonable time after notice of them is received.

▮▮▮▮ In addition, to establish an enforceable contract, there generally must be a meeting of the minds as to the essential terms of the agreement. *See Big Yank Corp. v. Liberty Mutual Fire Ins. Co.,* 125 F.3d 308, 314 (6th Cir.1997); *Lawler v. Burt,* 7 Ohio St. 340 (1876); *Bradley v. Farmers New World Life Ins. Co.,* 112 Ohio App.3d 696, 710, 679 N.E.2d 1178 (1996). In determining whether the required meeting of the minds has occurred, courts have highlighted the level of business acumen of the litigants. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 33, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (recognizing that Gilmer was "an experienced businessman"); *Asplundh Tree Expert Co. v. Bates,* 71 F.3d 592, 602 (6th Cir.1995) (noting that "the arbitration clause is contained in an employment contract between a highly paid executive and his corporate employer"); *General Elec. Co. v. G. Siempelkamp GmbH & Co.,* 29 F.3d 1095, 1099 (6th Cir.1994) (taking judicial notice "that GE is a sophisticated party that is used to dealing with complex international business transactions"). In circumstances where the conduct of the parties evidences the creation of a contract, however, a contract will be upheld, even though the writings of the parties do not suggest a meeting of the minds. *See* OHIO REV.CODE § 1302.10(C). "In such case, the terms of the particular contract consists of those terms on which the writings of the parties agree ..." *Id.* This is not the case, however, where parties disagree as to "dickered for" terms. *See General Elec. Co.,* 29 F.3d at 1098 *citing Alliance Wall Corp. v. Ampat Midwest Corp.,* 17 Ohio App.3d 59, 62, 477 N.E.2d 1206 (1984).

▮▮▮▮ In this case, the parties did not reach a meeting of the minds concerning the last look clause in 1992. Under the principles of Revised Code 1302.10, the parties effectively amended the Agreement to raise the contract price to $2.32/dth, but did not create a minimum and maximum purchase quantity requirement or delete the last look clause from the Agreement, When EMS sent the October 9, 1992 amendment letter to HLCC memorializing the contract price increase to $2.32/dth and proposing a minimum and maximum purchase amount, this letter served as an offer to amend the Agreement, which at that time included the last look clause. In response, HLCC agreed to the increase in contract price, but lowered the minimum and maximum purchase amounts and deleted the last look clause. Because HLCC's counter-proposal differed in terms from EMS' offer to amend, HLCC's amendment letter served as a proposal to amend the Agreement. *See* OHIO REV.CODE § 1302.10(B).

Under Revised Code 1302.10(B), such proposals are construed as proposals for addition to the contract, *unless,* among other things, they materially alter the existing contract or notification of objection to such proposals has already been given. *See id.* It is undisputed that the parties dickered over the last look clause. Indeed, for both parties, the status of the last look clause was a material term of the Agreement. The testimony at trial is clear on this issue. EMS did not concede to the removal of the last look clause but, in fact, vehemently objected to its removal. In the same vein, HLCC insisted upon the removal of the last look clause. Therefore, there was no meeting of the minds regarding the minimum purchase requirement and the removal of the last look clause. These additional terms did not, consequently, become a part of the Agreement in 1992 and, the previous terms of the Agreement remained in force, including the last look clause. See OHIO REV.CODE § 1302.10(B).

Although the parties did not achieve a meeting of the minds regarding the minimum purchase requirement and last look clause, the parties agreed to a price term. The agreement was amended by the parties' writings to the set price at $2.32/dth. See OHIO REV.CODE § 1302.10(B) (the terms of the particular contract consists of those terms on which the writings of the parties agree). As a result, the parties' October 1992 letters only amended the price term of the Agreement.

Further, the letters exchanged between the parties in 1992 were not executed, i.e., signed and returned. As previously noted,

the Agreement contains a no-modification-unless-in-writing clause which requires a signed writing to amend the terms of the Agreement. It is undisputed that the parties did not sign any of the October 1992 amendment letters; thus, the proposed amendments were not effective to remove the last look clause. Accordingly, in 1992, the last look clause remained a term of the Agreement.

■ The 1994 amendment, however, amended the contract price and deleted the last look clause from the Agreement. It is undisputed that no reference to the November 1990 amendment (the last look clause) was made in the 1994 amendment. In fact, at trial Strohen testified that in drafting the 1994 amendment he directed his administrative assistant to delete all reference to the November 1990 amendment from the boilerplate language used in the parties' prior amendments. This, after the parties had conducted stressful negotiations concerning the removal of the clause in 1992. Furthermore, the parties executed the 1994 amendment, an amendment that the last look clause was conspicuously absent from, in compliance with the no-modification-unless-in-writing clause.

■ Accordingly, because the parties are experienced businessmen, regularly engaged in contract negotiation, formation and contract modification, they are charged with applying the meaning and intent that the express language of their contracts manifests. *See Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244, 247, 313 N.E.2d 374 (1974) ("It is a well-known principle that contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language."); *see also Belville Mining Co. v. U.S.*, 999 F.2d 989, 995 (6th Cir.1993) (under Ohio law extrinsic evidence is admissible to illuminate the intent of the parties only where the terms of the deed are ambiguous). The Court is not persuaded that the parties intended to include the last look clause in the 1994 amendment when it had been excluded specifically from the contract. The absence of the last look clause from the language of the 1994 amendment effectively removed the clause from the

Agreement. The Court must give effect to the plain language and terms of the parties' contract. Thus, the Court finds that the last look clause was not a term of the Agreement at the time that HLCC gave termination notice in 1995.

In addition, the parties' course of performance suggests compliance with HLCC's counter-proposal letter removing the last look clause from the Agreement. EMS received HLCC's counter-proposal seeking to remove the last look clause from the Agreement and made no response. Instead, EMS acted in apparent compliance with the terms of the counter-proposal by raising the contract price and adhering to HLCC's modification of the minimum and maximum purchase amount. Had EMS responded to the counter-proposal, one way or the other, any question regarding the status of the last look clause could have been avoided. But no steps were taken to clarify the terms of the Agreement.

### IV.

For the foregoing reasons, the Court finds that the last look clause was not a term of the Agreement when HLCC gave notice of termination in 1995. Therefore, the Court hereby **Enters Judgment** for Defendant HLCC.

**IT IS SO ORDERED.**