In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-4395

E.C. STYBERG ENGINEERING COMPANY,

*Plaintiff-Appellant,*

*v.*

EATON CORPORATION,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03-C-0571—**David R. Herndon**, *Judge.*

———————

ARGUED JUNE 1, 2007—DECIDED JULY 9, 2007

———————

Before FLAUM, MANION, and ROVNER, *Circuit Judges.*

FLAUM, *Circuit Judge.* E.C. Styberg Engineering Co. ("Styberg") sued Eaton Corp. ("Eaton"), claiming that it breached a contract to buy 13,000 transmission components from Styberg. After a bench trial, the district court found that no contract existed and entered judgment for Eaton. Styberg appeals, and, for the following reasons, we affirm.

## I. BACKGROUND

Styberg manufactures custom components for other manufacturers, and Eaton manufactures, among other

things, motor vehicle parts and accessories, including transmissions. From 1998 to 2000, Styberg manufactured Part No. A-6871, an Inertia Brake Assembly ("I-brake"), for Eaton's six-speed transmissions. In August 1998, Styberg began selling prototype I-brake units to Eaton, and, in November, Eaton began purchasing limited quantities of I-brakes so it could test the product in the marketplace. Subsequently, Eaton decided to pursue full production of I-brakes, and, in 1999, the parties began negotiating an agreement under which Styberg would produce large quantities of I-brakes for Eaton.

As negotiations proceeded, John Baker, Styberg's Engineering and Quality Assurance Manager, kept in contact with two Eaton employees: Al Davis, an engineer, and Lisa Fletcher, Eaton's buyer.[1] On May 27, 1999, Davis sent Baker an e-mail expressing Eaton's willingness to make a minimum purchase commitment to Styberg. Davis stated,

> I know that Styberg wants a commitment for a minimum number of units that Eaton will buy (to protect Styberg's capital expenditures). I believe Eaton is willing to give Styberg that commitment as well. . . . At the very least, I believe Eaton will guarantee the number of units it takes to pay off your capital investments, however many that is. (like the 13,000 we were discussing before) . . . .

Getting a minimum unit commitment from Eaton was important to Styberg because, as Davis' e-mail suggests, Styberg had to expend significant capital to mass-produce the custom-designed parts.

On July 8, 1999, Baker sent Fletcher a proposal for a 60,000 unit order. According to the proposal, the first

---

[1] Fletcher died before trial and was only partially deposed.

13,000 units sold would have an average price of $544.88. The initial price of the units would be $595, but the price would progressively decrease as Styberg tweaked and perfected its manufacturing process. The proposal contained additional conditions, including a re-evaluation of the price and delivery schedule after the first 6,000 units were produced and an additional $31 per unit charge until a certain snap-in coil became available for manufacturing. Furthermore, the proposal requested $343,000 in "tooling money"– money that would assist Styberg in acquiring materials for its customized production. It also stated that Styberg would begin full production of the I-brakes in six months.

In his telephone log from July 16, 1999, Baker wrote, "Lisa Fletcher Quote was received. We have the 13,000 order!" A few days later, on July 22 and 23, Davis was visiting Styberg and met with its Vice President of Manufacturing, Ron Jones. Jones asked Davis for Eaton's commitment to buy at least 60,000 units, or, in the alternative, to buy 20,000 units with an additional capital investment of $1.2 million. Davis did not respond to the request while he was on site. On July 26, he e-mailed Fletcher, noting that Styberg representatives had indicated that they needed "a larger total unit commitment [than 13,000]" before the company would increase its monthly production capacity.

In a letter to Baker dated July 29, 1999, Fletcher wrote:

> Enclosed please find a tooling commitment . . . . [W]ith this $293,000 investment Styberg will be able to produce assembly A-6971 at a rate of up to 1,400 units per month, with an approximate lead time of four months.
>
> Eaton will purchase a minimum of 13,000 units at an average unit price of $544.88 by July 29th, 2001. Additional requirements will be based on the market

competitiveness and product value as the initial 13,000 units are consumed. . . .

On August 9, 1999, Baker and Fletcher spoke on the telephone and Baker told Fletcher, "thank you." According to Baker, he said "thank you" to indicate to Fletcher that Styberg agreed to produce the minimum quantity at the average price. However, Baker's notes from the phone call say, "13,000 units doesn't cover [Styberg's capitalization for the project] . . . 25 to Ron's 30,000." During cross-examination, Baker acknowledged that the notation meant that Styberg's Vice President of Manufacturing wanted a 25,000 to 30,000 unit commitment.

On September 1, 1999, employees from both companies participated in a conference call. Fletcher's notes from the call state, "we commit to 13K units—Styberg sez [sic] not enough to justify their capital investment. Want at least 30K commitment. . . . Styberg will come back w/ capacity + quotes for 13K flat out." According to Baker, the parties to the conference call agreed that, in regard to the 13,000 unit order, Baker would prepare a schedule for Fletcher that detailed the number of units Styberg could produce each month with its present capital.

On September 9, 1999, Baker sent Fletcher a production schedule that included a detailed break-down of Styberg's anticipated monthly production capacity for 13,000 units as well as a quote for an initial unit price of $595 plus $31 per unit until the snap-in coil became available. The quote stated that the estimated delivery date would "be based on a starting date four months after an agreement on casting design, unit price, and delivery schedules." Baker testified that on September 27, 1999, Fletcher told him that the schedule was acceptable. However, Baker's notes from September 27 include the notation "LM," which, according to earlier testimony, meant that he left a message for Fletcher and did not speak with her.

Eaton did not issue a specific purchase order for the 13,000 I-brakes, but Baker contends that Fletcher told him to use an existing purchase order. Styberg did not execute or send Eaton a purchase order acknowledgment for the 13,000 unit order. In April 2000, Eaton notified Styberg that it expected delivery of 240 units. Styberg shipped the units under an existing purchase order, and Eaton paid for the units. On May 8, 2000, Eaton requested another 240 units for shipment, which were to be delivered the following month. Three days later, however, Eaton cancelled the request. After May 11, 2000, Eaton neither ordered nor paid for any I-brakes. In May 2003, after settlement discussions broke down, Styberg sued Eaton in the district court for breach of contract, seeking approximately $3.4 million in damages, which represented Styberg's lost profits and inventory related to the manufacture of 13,000 I-brakes.[2]

After a four-day trial, the district court entered judgment in favor of Eaton, summarizing the case as follows:

---

[2] This case is in federal court pursuant to 28 U.S.C. § 1332, which confers federal jurisdiction where the parties are citizens of different states and the amount in controversy exceeds $75,000. Styberg is a Wisconsin corporation with its principal place of business in Wisconsin; Eaton is an Ohio corporation with its principal place of business in Ohio; and Styberg seeks more than $3 million from Eaton. The dispute is governed by Ohio law because Eaton's purchase orders provide that they are "governed[,] interpreted[,] and constructed by, and in accordance with, the law of the State of Ohio." Although Styberg denies that Ohio law governs the *entire* dispute, it does not develop its choice-of-law argument and relies almost exclusively on Ohio law. Accordingly, any dispute about which state's law controls is waived. *See United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (stating that perfunctory and undeveloped arguments are waived).

> Based on the record, the Court finds that there was not a contract. Styberg could not meet and refused to accept any of the proposed terms. It needed additional money for tooling. It could not meet the monthly production targets set in the letter and purchase order. It needed to increase the unit price to cover design changes. It needed a higher total number of unit sales to cover its expenses. Finally, it needed more lead time and needed to extend the timetable by nearly a year. The parties never came to like terms of any kind of agreement. When asked of the Plaintiff to point to what constituted the agreement, Plaintiff was not able to do so in a manner that even came close in a legally satisfactory manner. For a company that did business on the written word of contracts, they were unable to produce one.

The district court characterized the e-mail, telephone, and letter exchanges as evidence of continuing negotiations in which the parties could not agree on key terms like quantity, price, and monthly production volume. Accordingly, it concluded that the parties never formed a contract. Styberg appeals.

## II. DISCUSSION

On appeal, Styberg claims that the district court's factual findings and legal conclusions were erroneous, and that this Court should enter judgment in its favor. We review the trial court's determination that no contract existed for clear error. *See Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 307 (7th Cir. 2002); *Teamsters Local Unions Nos. 75 and 200 v. Barry Trucking, Inc.*, 176 F.3d 1004, 1010 (7th Cir. 1999) (recognizing that the existence of a contract is a mixed question of law and fact subject to clear error review). Additionally, after a full bench trial, we may not set aside the district court's

findings of fact unless they are clearly erroneous. *Cerros v. Steel Techs., Inc.,* 288 F.3d 1040, 1044 (7th Cir. 2002). Moreover, this Court gives significant deference to the trial court's credibility assessments. *Id.*[3]

Ohio Revised Code § 1302.07(A), the state's codification of UCC § 2-204, provides that "a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Courts and commentators agree that the UCC takes a liberal view towards what is required to create a contract for the sale of goods. *See, e.g.*, *Architectural Metal Sys., Inc. v. Consol. Sys., Inc.*, 58 F.3d 1227, 1230 (7th Cir. 1995) (recognizing that the UCC tolerates "a good deal of incompleteness and even contradiction in offer and acceptance"); WHITE AND SUMMERS, UNIFORM COMMERCIAL CODE § 1-2 at 4-5 (4th Ed. 1995) (noting that Article 2 of the UCC makes contracts easier to form by reducing the required formalities); *Am. Bronze Corp. v. Streamway Prods.*, 456 N.E.2d 1295, 1299 (Ohio Ct. App. 1982) (recognizing that § 1302.07 liberally defines the formation of sales contracts). Notably, however, nothing in the UCC or Ohio's code eliminates the requirement that, for a contract to be enforceable, it "must . . . be specific as to its essential

---

[3] Styberg argues that less deferential review is appropriate because the district court completely ignored Ohio's codification of the Uniform Commercial Code ("UCC"). We disagree. The district court's written opinion specifically relied on Ohio's Commercial Code and cases applying it. For example, the court cited *Alliance Wall Corp. v. Ampat Midwest Corp.*, 477 N.E.2d 1206 (Ohio Ct. App. 1994) (applying Ohio's Commercial Code) and *Energy Marketing Services, Inc. v. Homer Laughlin China Co.*, 186 F.R.D. 369 (S.D. Ohio 1999) (applying Ohio's Commercial Code), in addition to various provisions of the Ohio statute.

terms, such as the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term." *Alligood v. Procter & Gamble Co.*, 594 N.E.2d 668, 669 (Ohio Ct. App. 1991).

In this case, Styberg argues that the documentary evidence conclusively established the existence of a contract and that the district court erred in finding that no contract was formed. According to Styberg, the parties agreed that Eaton would purchase 13,000 I-brakes from Styberg at an average unit price of $544.88. Styberg identifies three possible sources for the alleged contract: 1) Lisa Fletcher's July 29, 1999 letter; 2) Baker's September 9, 1999 schedule; and 3) Eaton's request for I-brakes in the Spring of 2000.

First, Styberg argues that Lisa Fletcher's July 29 letter was either an acceptance of Styberg's July 8 offer to supply Eaton with 13,000 I-brakes or an offer to purchase I-brakes that Baker accepted on August 9, 1999 by saying "thank you." Then, according to Styberg, although the parties had a contract with the price and quantity terms firmly in place, they continued to negotiate about larger orders and other open terms. Eaton, on the other hand, characterizes Lisa Fletcher's letter as part of a series of ongoing negotiations, during which Eaton and Styberg could not agree on the essential terms. Eaton claims that Styberg wanted a commitment for some 20,000 to 60,000 I-brakes in order to justify its capital investment, and Eaton did not want to be bound by such a large commitment.

In our view, the district court did not err by concluding that the communications were ongoing negotiations about a contract that never came to fruition rather than an actual contract. Indeed, the court's decision was supported by relevant case law, which states that typically, a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract. *See Dyno*

*Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) (applying Ohio law). If Styberg's July 8 price quotation was not an offer, then the July 29 letter could not have been an acceptance. Moreover, "it is most often the buyer's purchase order, submitted in response to such a quotation that constitutes the offer." *Babcock & Wilcox Co. v. Hitachi Am., Ltd.* 406 F. Supp. 2d 819, 827 (N.D. Ohio 2005). The parties agree that Lisa Fletcher did not send Styberg a purchase order for 13,000 I-brakes.

Even assuming that Fletcher's letter was an offer in response to the price quotation, the district court's finding that Styberg rejected the offer and continued to push for a higher minimum-unit commitment was a reasonable interpretation of the evidence. After Baker allegedly manifested his acceptance by saying "thank you" on August 9, the two companies participated in a conference call during which Styberg again indicated that a 13,000 unit commitment was not enough. Baker's own notes from the September 1 call state that September 15 was "'D' Day agreement," presumably meaning the parties had not yet formed a contract on September 1.

Next, Styberg argues that a contract was formed on September 27, 1999, when Fletcher told Baker that his proposed schedule from September 9 was acceptable. We reject this argument as well. The district court found that Fletcher never made such a comment, and that finding was not clearly erroneous. The court emphasized that Baker's own notes from September 27 indicated only that he left a message for Fletcher, suggesting that he never spoke with her at all. Because the district court's conclusion was supported by its assessment of Baker's credibility as well as the documentary evidence, we are in no position to second-guess it.

Finally, Styberg contends that the parties' conduct clearly demonstrated the existence of a contract. We

disagree. The district court found that Eaton's request for two 240-unit orders at the price specified in Styberg's quotes was insufficient to prove an agreement for the sale of 13,000 units, and that conclusion was not clearly erroneous. Although one Ohio court has required a buyer who accepted $5,500 worth of cable to accept all $35,000 worth of it, the buyer in that case had sent the seller a purchase order for the full amount, which the seller accepted by shipping the goods. *TLG Elecs, Inc. v. Newcome Corp.*, No. 01AP-821, 2002 WL 338203, at *3 (Ohio Ct. App. March 5, 2002). Here, by contrast, Eaton did not submit a purchase order for 13,000 I-brakes, so accepting the 240-unit shipment did not require it to accept 13,000.

Moreover, courts finding contracts based on parties' conduct have typically done so either where there was repeated and ongoing conduct manifesting an agreement or where the parties had an established course of dealing to which they adhered. *See, e.g.*, *Central Transp., Inc. v. Cleveland Metallurgical Supply Co.*, No. 63055, 1993 WL 266924, at *2-3 (Ohio Ct. App. July 15, 1993) (holding that the parties' conduct manifested an agreement where the buyer submitted a purchase order, the seller shipped coal to the buyer on numerous occasions, the buyer paid for each shipment, and the parties continued to do business even after a dispute arose between them); *Am. Bronze*, 456 N.E.2d at 1300 (finding a binding contract was formed where the parties followed their usual procedures for placing and accepting orders). In this case, Eaton's two requests for 240 I-brakes, one of which was cancelled, did not come close to the repeated, ongoing dealing that proved a contract in *Central Transport*, nor did it adhere to the parties usual course of dealing as in *American Bronze*. In fact, if the parties intended to contract, they deviated from their usual procedure because, historically, Eaton would submit a specific purchase order to Styberg and Styberg would

send Eaton a purchase order acknowledgment form. Therefore, the district court properly could have concluded that Eaton placed the orders pursuant to the parties' previous arrangement dating back to 1998 rather than a new contract for 13,000 units.[4]

In short, the district court accepted Eaton's interpretation of ambiguous evidence and its choice between two reasonable interpretations of that evidence was not clearly erroneous. *See Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (stating that clear error review does not permit an appellate court to reverse merely because it would have decided the case differently).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

[4] Even under a partial-performance theory of liability, Eaton accepted and paid for the order that Styberg filled, so it met its obligations. *See* Ohio Rev. Code § 1302.04 Cmt. 2 (noting that where partial performance is the basis for finding the existence of a contract, recovery is limited to the scope of the performance); *Royal Doors, Inc. v. Hamilton-Parker Co.*, No. 92AP-938, 1993 WL 141233, at *5-6 (Ohio Ct. App. April 29, 1993) (same).