*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CONOCOPHILLIPS ALASKA, INC., | ) | |
| | ) | Supreme Court Nos. S-14654/14674/14953 |
| Appellant and | ) | (Consolidated) |
| Cross-Appellee, | ) | |
| v. | ) | Superior Court No. 3AN-08-08998 CI |
| | ) | |
| WILLIAMS ALASKA | ) | O P I N I O N |
| PETROLEUM, INC., | ) | |
| | ) | No. 6874 – March 14, 2014 |
| Appellee and | ) | |
| Cross-Appellant. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, John Suddock, Judge.

Appearances: Spencer C. Sneed and Katherine Demarest, Dorsey & Whitney, LLP, Anchorage, for Appellant/Cross-Appellee. Paul L. Davis, K&L Gates, LLP, Anchorage, and Randolph L. Jones, Jr., Conner & Winters, LLP, Dallas, Texas, for Appellee/Cross-Appellant.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

## I.    INTRODUCTION

Williams Alaska Petroleum owned and operated a refinery, which ConocoPhillips Alaska supplied with crude oil pursuant to an Exchange Agreement.

ConocoPhillips demanded that Williams tender a payment of $31 million as adequate assurances of Williams's ability to perform if an ongoing administrative rate-making process resulted in a large retroactive increase in payments that Williams would owe ConocoPhillips under the Exchange Agreement. ConocoPhillips offered to credit Williams with a certain rate of interest on that principal payment against a future retroactive invoice. Williams transferred the principal of $31 million but demanded, among other terms, credit corresponding to a higher rate of interest. Williams stated that acceptance and retention of the funds would constitute acceptance of all of its terms. ConocoPhillips received and retained the funds, rejecting only one particular term in Williams's latest offer but remaining silent as to which rate of interest would apply. Years later, after the conclusion of the regulatory process, ConocoPhillips invoiced Williams retroactively pursuant to the Exchange Agreement. ConocoPhillips credited Williams for the $31 million principal already paid as well as $5 million in interest on that principal calculated using the lower of the two interest rates. Williams sued ConocoPhillips, arguing that a contract had been formed for the higher rate of interest and that it was therefore owed a credit for $10 million in interest on the $31 million principal.

On cross-motions for summary judgment, the superior court initially ruled for Williams, concluding that a contract for the higher rate of interest had formed under the Uniform Commercial Code (UCC) § 2-207(1) when ConocoPhillips retained the $31 million while rejecting one offered term but voicing no objection to Williams's specified interest term. On a motion for reconsideration, the superior court again ruled for Williams, this time determining that a contract for the higher rate of interest had formed based on the behavior of the parties after negotiation under UCC § 2-207(3), or, in the alternative, that Williams was entitled to a credit for a different, third rate of interest in

quantum meruit. The superior court also ruled in favor of Williams on all issues related to attorney's fees and court costs.

ConocoPhillips and Williams both appeal. We conclude that the superior court was right the first time and that the parties entered into a contract for the higher rate of interest under UCC § 2-207(1). Thus, it was incorrect for the superior court to rescind its initial summary judgment order as improvidently granted. Accordingly, we do not reach the UCC § 2-207(3) or quantum meruit holdings of the superior court's order on reconsideration. Finally, we affirm all of the superior court's actions with regard to attorney's fees and court costs.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. The parties and the contract

In December 1999, BP Oil Supply Company and Williams Energy Marketing & Trading Company entered into a contract for the sale of crude oil, called an Exchange Agreement. Within months, the rights and duties of the original parties to this Exchange Agreement were assigned to the parties to the present case: ConocoPhillips and Williams.

Under the Exchange Agreement, ConocoPhillips would provide Williams's refinery at North Pole with crude oil from the Trans-Alaska Pipeline System. Williams would extract valuable components from the crude oil and provide an equal volume of lower-quality crude back to ConocoPhillips, and ConocoPhillips would then return the crude oil to the pipeline. The Trans-Alaska Pipeline System operates a "Quality Bank," which compensates all pipeline shippers for the degradation in the average quality of crude in the pipeline downstream caused by tender of less-valuable crude upstream. The Quality Bank Administrator assesses "degradation charges" to shippers tendering comparatively lower-value crude to the pipeline based on a quality pricing scheme set

-3- **6874**

by the Federal Energy Regulatory Commission (FERC) and the Regulatory Commission of Alaska (RCA). ConocoPhillips, as the shipper tendering lower-quality crude back into the pipeline, would be assessed degradation charges by the Administrator. The Exchange Agreement's pricing provision, on top of a flat per-barrel fee, required Williams to reimburse ConocoPhillips for such degradation charges, including any retroactive adjustments resulting from new FERC regulations.

The Exchange Agreement contained two additional provisions relevant to this case. First, an adequate-assurances clause specified that when one party "has reasonable grounds for insecurity," that party may demand "adequate security for, or assurances of [the other party's] ability to perform, all of its obligations under the Agreement." If adequate security or assurances were not forthcoming within 48 hours, the demanding party would "have the right to liquidate the Agreement" and cease performance of its other obligations under the Exchange Agreement. Second, a signed-writing clause specified that "[n]o changes, alterations, or modifications . . . of the Agreement shall be effective unless agreed to in writing by an authorized representative of the Parties."

## 2. The dispute

In 2002, ConocoPhillips believed that it had reasonable grounds for insecurity. The FERC and the RCA initiated a regulatory rate-making process that could result in a retroactive increase in Quality Bank degradation charges to ConocoPhillips for its tender of lower-quality crude back into the pipeline. Under the pricing provision of the Exchange Agreement requiring reimbursement for retroactive degradation charges, Williams could owe ConocoPhillips substantial sums of money, the precise amount of which would depend on the agencies' promulgation of a revised pricing scheme, perhaps years in the future. ConocoPhillips, believing Williams and its parent company to be in a precarious financial position, doubted Williams's ability to pay a large, retroactively

assessed charge in the future. Invoking the adequate-assurances provision of the Exchange Agreement, ConocoPhillips sent Williams an initial demand letter on October 4 stating its position that Williams "now owes" $31,268,645 in "Quality Bank adjustments to the price of oil" already exchanged over the prior two years under the contract. ConocoPhillips proposed a range of options for providing adequate financial assurances: a cash payment, a trust with ConocoPhillips as beneficiary, a letter of credit, or a senior security interest in Williams's property. This letter did not mention whether or at what rate ConocoPhillips would credit Williams for interest on any such assurance payment or security.

Following a series of telephone calls, Williams sent ConocoPhillips a letter on October 8. Williams disputed that it was in financial peril or that ConocoPhillips had reasonable grounds for insecurity. Williams also stated its view that potential future Quality Bank adjustments "are not currently due," as ConocoPhillips would have it, but rather "may become due in the future upon resolution of the Quality Bank proceedings." Nonetheless, fearing the harm that would come from ConocoPhillips halting the flow of crude, Williams offered to settle the dispute in a package deal that included, among other terms, wire transfer of $29.01 million to ConocoPhillips. This principal, plus interest that would accrue on the principal "calculated at the LIBOR six-month rate,"[1] would be "held by ConocoPhillips for Williams'[s] account" pending a resolution in the rate-making case, at which point "the advance payments to ConocoPhillips, including all interest thereon, will be applied toward any Quality Bank Amounts so determined to be due from Williams." On October 11, ConocoPhillips responded, saying it might be willing to meet some of Williams's conditions for settlement but demanding a payment

---

[1]    LIBOR, or the London Interbank Offered Rate, is the interest rate that large London banks charge each other for short-term loans.

of $35,245,181. The letter made no mention of Williams receiving credit for interest on that sum in the future. In a follow-up letter dated October 17, ConocoPhillips proposed that Williams pay $35,245,181 "as a partial preliminary settlement payment" of any retroactively assessed Quality Bank degradation charges. For the first time, ConocoPhillips offered to credit Williams for interest earned on the principal at the LIBOR rate.

On October 18, Williams wired $31,268,645 to ConocoPhillips. Later that day, Williams sent ConocoPhillips a letter stating that the money was intended to "avoid[] litigation and resolv[e] the disputes" over retroactive price modifications under the Exchange Agreement. Williams specified that "ConocoPhillips'[s] receipt and retention of the $31,268,645 . . . shall constitute ConocoPhillips'[s] agreement with the terms set forth in . . . this letter." The letter's terms included three substantive provisions: (1) that the "full principal amount" already wired to ConocoPhillips receive interest at a "rate prescribed by FERC"[2] and that the principal and interest would be held by ConocoPhillips for Williams's account and later be credited toward any final retroactive assessments; (2) that ConocoPhillips agree to "continue good faith efforts" in "vigorous support" of a preexisting joint-negotiating agreement that would present a united front in the FERC rate-making case; and (3) that the parties agree to keep the agreement "in strictest confidence."

On October 29, ConocoPhillips responded, acknowledging that it had "received and retained the Payment as a preliminary partial settlement," using language mirroring Williams's specification of the mode of acceptance of the terms in its October 18 letter. ConocoPhillips stated that it "does not agree with all of the terms

---

[2] The parties expected the FERC to impose interest on any retrospectively assessed degradation charges. The FERC rate imposed by regulation was expected to be substantially higher than the LIBOR rate.

stated in [Williams's October 18 letter]" and "also do[es] not believe it would prove productive to conduct a letter writing campaign as to what the Payment represents or specific terms and conditions associated with the Payment." ConocoPhillips did object to one term in particular. It noted that it would voluntarily continue to support the joint-negotiating efforts in front of the FERC under the terms of the preexisting agreement on the issue, but it denied "[any] linkage whatsoever between ConocoPhillips['s] right to adequate assurance under the Agreement and ConocoPhillips'[s] performance with respect to" the independent joint-negotiating agreement. ConocoPhillips did not address the issue of whether or at what rate the cash payment would accrue interest.

After ConocoPhillips's October 29 letter, there was no further communication between the parties about the principal payment or accrual of interest until the FERC rate-making case finally came to a close in July 2007. In August 2007, ConocoPhillips invoiced Williams for reimbursement of the retroactively assessed Quality Bank degradation charges amounting to over $167 million, giving Williams credit for the $31 million prepayment as well as accrued interest at the LIBOR rate amounting to an additional $5 million, yielding a final billed amount of $131 million. Williams paid ConocoPhillips about $5 million less than the invoiced amount, claiming it deserved credit on the $31 million prepayment at the (higher) FERC interest rate which would amount to a $10 million interest credit. ConocoPhillips responded by revising its invoice to give no credit for any interest on the $31 million prepayment, claiming that no agreement had been reached on the issue.

**B.**     **Judicial Proceedings And The Superior Court's Holdings**

Litigation ensued,[3] and in 2009 both parties moved for summary judgment on the effect of the October 2002 correspondence with respect to interest credits. Both parties agreed that "no issues of material fact prevent[ed] summary resolution of that issue." The superior court applied Ohio's substantive contract law pursuant to the Exchange Agreement's choice-of-law provision and found that there was no conflict with Alaska law because both states had adopted the Uniform Commercial Code.

The superior court granted summary judgment to Williams. The superior court concluded that under the Uniform Commercial Code §§ 2-207(1) & (2)[4] the

---

[3]      In September 2007, the parties entered into a Quality Bank Interest Dispute Resolution Agreement in which the parties agreed to "jointly file for a Declaratory Judgment Order" and to limit discovery and briefing. As relevant to the attorney's fee dispute in this case, the parties also agreed that "[t]he prevailing Party in the Declaratory Judgment proceeding shall be entitled to recover reasonable attorney fees and court costs" to be "paid within twenty (20) days after receipt of an invoice for such costs containing documentation reasonably supporting the amounts."

[4]      Sections 2-207(1) & (2) of the Uniform Commercial Code, codified and slightly amended at Ohio Rev. Code Ann. § 1302.10(A) & (B) (West 2013), state:

> (1)     A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

> (2)     The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

> > (a)     the offer expressly limits acceptance to the terms of the offer;

(continued...)

October 18 and October 29 letters modified the Exchange Agreement and that the resulting contract required ConocoPhillips to credit Williams with interest on the prepayment at the higher FERC interest rate proposed by Williams in its October 18 letter. ConocoPhillips's October 29 reply letter constituted a "definite and seasonable expression of acceptance" of Williams's October 18 offer. Because ConocoPhillips acknowledged receipt and retention of the $31 million prepayment, mirroring the conditions of acceptance in Williams's October 18 offer, and explicitly objected to only one term of the offer, while remaining silent as to interest and otherwise just hinting at unspecified additional quibbles, the court found that ConocoPhillips "grudgingly but definitively assented" to Williams's reasonable proposal of FERC interest.

Neither party had briefed the application of UCC § 2-207. ConocoPhillips moved for reconsideration, and the superior court ordered further briefing. The superior court concluded that it "improvidently granted summary judgment that a contract was formed pursuant to [UCC § 2-207(1)]" because ConocoPhillips's "express rejection of Williams's joint-negotiating provision" renders disputable the material factual inference that ConocoPhillips's letter of October 29, 2002 was a definite and seasonable expression of acceptance. Nevertheless, the court again granted summary judgment for Williams, this time concluding that the parties' behavior after October 2002 created an implied-in-fact contract under UCC § 2-207(3)[5] and that one of the terms of that contract

---

**4**(...continued)

> (b)     they materially alter it; or

> (c)     notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

**5**     Section 2-207(3) of the UCC, codified and slightly amended at Ohio Rev. Code Ann. § 1302.10(C) (West 2013), states:

(continued...)

was the FERC interest that Williams had proposed on October 18 and ConocoPhillips had objectively accepted on October 29. In the alternative, the superior court held that, if this court were to reverse summary judgment as to contract formation, Williams would be entitled to recovery in quantum meruit for the benefit to ConocoPhillips of the time-value of the $31 million prepayment, measured by the average market rate for commercial paper during the relevant period.

The superior court granted Williams's motion to enlarge time to file a motion for attorney's fees and subsequently granted Williams full attorney's fees and court costs as the prevailing party under the Dispute Resolution Agreement between Williams and ConocoPhillips.

## C.    Arguments On Appeal

Both parties appeal. ConocoPhillips seeks reversal of summary judgment and entry of summary judgment in its own favor on a theory that no contract was formed for any interest rate. It also argues that no interest should be paid to Williams under a theory of quasi-contract or quantum meruit. Williams seeks reversal of the superior court's order on reconsideration rescinding the initial summary judgment order as improvidently granted, arguing that a contract was formed under UCC §§ 2-207(1) & (2) as the superior court originally held. Williams also seeks reversal of the superior court's

---

[5](...continued)

> (3)    Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

alternative quantum meruit holding, arguing that it should receive FERC interest rather than commercial-paper interest awarded in quantum meruit.

As to attorney's fees and court costs, ConocoPhillips argues that the superior court abused its discretion by granting Williams's motion to enlarge time to file a motion for attorney's fees, by enlarging Williams's time to file a cost bill with the Clerk of Court, and by granting full attorney's fees and costs without reducing the award for various reasons.

## III.   STANDARD OF REVIEW

We review rulings on motions for summary judgment de novo, "reading the record in the light most favorable to the non-moving party and making all reasonable inferences in its favor."[6]  A party is entitled to summary judgment only if there is no genuine issue of material fact and if the party is entitled to judgment as a matter of law.[7] "A genuine issue of material fact exists where reasonable jurors could disagree on the resolution of a factual issue."[8]  "Whether the evidence presented a genuine issue of material fact is a question of law that we independently review."[9]  Determinations of which legal authorities apply in a case[10] and interpretations of what those legal

---

[6]     *Witt v. State, Dep't of Corr.*, 75 P.3d 1030, 1033 (Alaska 2003).  The same standard applies to orders granting, denying, and reconsidering summary judgment, all of which are presented on appeal in this case.

[7]     *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985).

[8]     *Kalenka v. Jadon, Inc.*, 305 P.3d 346, 349 (Alaska 2013) (quoting *Burnett v. Covell*, 191 P.3d 985, 990 (Alaska 2008)).

[9]     *Id.*

[10]     *Cf. L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1118 (Alaska 2009) ("Where 'the admissibility of evidence turns on whether the trial court applied the correct legal
(continued...)

authorities mean[11] are questions of law subject to de novo review. Contract interpretation is a question of law subject to de novo review.[12] When applying the de novo standard of review, we apply our "independent judgment to questions of law, adopting the rule of law most persuasive in light of precedent, reason, and policy."[13]

## IV. DISCUSSION

### A. UCC § 2-207 Applies To This Case To Determine Whether An Original Contract For Sale Of Oil Has Been Modified, And The Additional Requirements Of § 2-209 Regarding Modification Have Been Satisfied Or Waived.

The parties vigorously dispute which article and sections of the UCC govern this case. We conclude that the superior court correctly held that Article 2 of the UCC and § 2-207 apply to this case, notwithstanding ConocoPhillips's arguments that Article 9 or § 2-209 should govern to the exclusion of § 2-207.

#### 1. Article 2 of the UCC, rather than Article 9, applies to this case.

ConocoPhillips and Williams disagree as to which article of the UCC applies in this case: Article 2, which governs "transactions in goods" but not "any

---

[10](...continued)
standard, we review the [lower] court's decision using our independent legal judgment.' " (quoting *Marsingill v. O'Malley*, 128 P.3d 151, 155-56 (Alaska 2006))).

[11]  *Cf. id.* ("Issues regarding the constitutionality of statutes are questions of law that we review de novo. We review the interpretation of a statute de novo . . . ." (citing *Alaskans For Efficient Gov't, Inc. v. Knowles*, 91 P.3d 273, 275 (Alaska 2004); *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 603 (Alaska 1999))).

[12]  *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012) (citing *Burns v. Burns*, 157 P.3d 1037, 1039 (Alaska 2007)).

[13]  *Russell ex rel. J.N. v. Virg-In*, 258 P.3d 795, 802 (Alaska 2011) (quoting *Jacob v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 177 P.3d 1181, 1184 (Alaska 2008)) (internal quotation marks omitted).

transaction . . . intended to operate only as a security transaction,"[14] or Article 9, which governs transactions that "create[] a security interest in personal property or fixtures."[15] ConocoPhillips argues that Article 9 should apply because the parties intended to "create an interest in the $31 million to secure Williams'[s] future payment obligations." Williams argues that Article 2 should apply because the parties' correspondence in October 2002 was a modification of the original Exchange Agreement for the sale of goods and the $31 million was a prepayment of a future obligation under that contract.[16]

The superior court concluded that the $31 million was a prepayment as part of a contract modifying the original Exchange Agreement for a sale of goods and was thus covered by the provisions of Article 2. We agree.

First, the superior court concluded that the parties intended the $31 million and subsequent agreement to constitute a "prepayment of an unliquidated account payable" rather than a security transaction. We agree and conclude that there is no genuine issue of material fact on this point. ConocoPhillips styled the payment as a "preliminary partial settlement" in its letter of October 29. ConocoPhillips now argues that it meant to indicate that the payment was a partial settlement of ConocoPhillips's

---

[14] OHIO REV. CODE ANN. § 1302.02 (West 2013) (codifying U.C.C. § 2-102).

[15] *Id.* § 1309.109(A)(1) (codifying U.C.C. § 9-109).

[16] The parties vigorously dispute this preliminary issue because of their perception that Article 2 and Article 9 differ substantially in how they would apply to this case. ConocoPhillips argues that Article 9 imposes no duty to give credit for interest on cash collateral absent any actual interest earned and that any agreement for interest would have to be established under traditional common law rules of offer and acceptance. Williams seeks to benefit from the relaxed contract-formation provisions of § 2-207 to find a contract for FERC interest resulting from the October 2002 correspondence. Because we hold in favor of Williams under § 2-207(1), we do not reach ConocoPhillips's argument about the outcome of the case under Article 9.

demands for an adequate security interest, but the record supports the superior court's contrary conclusion. The October 29 letter refers to the payment as a preliminary partial settlement, not of ConocoPhillips's demands for an adequate security interest, but rather of a dispute over the pricing provision of the Exchange Agreement with respect to retroactive Quality Bank adjustments.[17] The course of negotiations provides further support for this view. ConocoPhillips's first demand letter argued that Williams "now owes" ConocoPhillips $31 million under the Exchange Agreement's pricing provision due to forthcoming Quality Bank adjustments that would be made retroactive. Williams disagreed, arguing in its letter of October 8 that the money was "not currently due" under the contract. It was this dispute over when the retroactive assessment charges would come due that the parties intended to settle with the wire transfer and subsequent agreement. The superior court correctly interpreted the Exchange Agreement's adequate-assurances provision, not as providing a right to demand security interests, but rather as "invit[ing] a negotiation between the parties regarding the nature and extent of additional consideration for the [continued] sale of goods" with a "contemplated outcome [of] a modification of the original sale contract such that the ground for insecurity be abated or ameliorated." ConocoPhillips treated the adequate-assurances provision similarly in its initial demand letter of October 4 when it cited the adequate-assurances provision and then laid out a number of options for settling the dispute going beyond mere security interests, including making a cash payment, establishing a trust, providing a letter of credit, and providing a security interest.

Second, as a matter of law, the Ohio courts have held that Article 2's scope, covering "transactions in goods," encompasses far more than just the original contract

---

[17] Five years later, ConocoPhillips continued to view the $31 million payment as an "advance[]," at least in an internal email.

for sale and also includes subsequent agreements to modify the original contract, such as by establishing new payment schedules.[18]  Thus, we conclude that the superior court correctly determined that, due to the parties' intent to modify the original contract for the sale of goods, Article 2 would apply to the question of contract formation in this case.

### 2. UCC § 2-207 applies to the contract modification in this case alongside the additional requirements of § 2-209.

ConocoPhillips and Williams also disagree as to which specific sections of Article 2 of the UCC, if any, should apply in this case: § 2-209 to the *exclusion* of § 2-207, or § 2-209 in *addition* to § 2-207?  We conclude that the superior court correctly held that § 2-209 should apply in addition to § 2-207, and we further conclude that the superior court correctly determined that the additional requirements of § 2-209 have been satisfied in this case.

As relevant here, UCC § 2-209, titled "Modification, Rescission and Waiver," establishes several important rules governing modification of contracts within the scope of Article 2 of the UCC.  First, § 2-209(1) abrogates the common law and specifies that "[a]n agreement modifying a contract within [Article 2 of the UCC] . . . needs no consideration to be binding."[19]  Second, § 2-209(2) establishes that "[a] signed agreement which excludes modification or rescission except by a signed writing" is enforceable and that the agreement "cannot be otherwise modified or rescinded."[20]

---

[18]  *See, e.g.*, *May Co. v. Trusnik*, 375 N.E.2d 72, 74-75 (Ohio App. 1977) (holding that Article 2 governed an installment payment agreement modifying an original sales contract for consumer goods after the buyer defaulted under the original payment plan).

[19]  OHIO REV. CODE ANN. § 1302.12(A) (West 2013) (codifying U.C.C. § 2-209(1)).

[20]  *Id.* § 1302.12(B) (codifying U.C.C. § 2-209(2)).

Finally, § 2-209(4) states that even if an attempted modification "does not satisfy the requirements of [subsection (2)] . . . it can operate as a waiver."[21]

As discussed in greater detail in section IV.B below, UCC § 2-207, titled "Additional Terms in Acceptance or Confirmation," relaxes the common law mirror-image rule, which held that a contract could be formed only if the acceptance was a "mirror image" of the offer, replicating all of the terms of the offer without adding conflicting or additional terms.[22] Instead of requiring a mirror-image acceptance, UCC § 2-207(1) permits contract formation whenever "[a] definite and seasonable expression of acceptance . . . is sent within a reasonable time . . . even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."[23]

ConocoPhillips argues that, even if Article 2 of the UCC were to apply in this case, UCC § 2-209 should govern to the exclusion of the lenient contract-formation rules of § 2-207.[24] ConocoPhillips reasons that § 2-207 addresses only initial contract formation and that any subsequent modification must satisfy § 2-209. ConocoPhillips

---

[21] *Id.* § 1302.12(D) (codifying U.C.C. § 2-209(4)).

[22] RESTATEMENT (SECOND) OF CONTRACTS § 59 (1981); 1 JAMES J. WHITE, ROBERT S. SUMMERS & ROBERT A. HILLMAN, UNIFORM COMMERCIAL CODE § 2:9, at 79 (6th ed. 2012).

[23] OHIO REV. CODE ANN. § 1302.10(A) (codifying U.C.C. § 2-207(1)).

[24] Williams argues that ConocoPhillips failed to make this argument to the superior court and thus should not be able to raise it for the first time in this court. But a review of the record reveals that ConocoPhillips did argue to the superior court in its motion for reconsideration that "UCC 2-209 preempts UCC 2-207" and styled its arguments about UCC § 2-207's application to this case in the alternative. Thus, the superior court was premature in stating in its order on motion for reconsideration that "Conoco and Williams now agree that UCC section 2-207 is applicable." We conclude that ConocoPhillips did not waive its § 2-209 argument.

contends modifications governed by § 2-209 can gain no help from § 2-207's limited alterations of the common law because § 2-209 leaves untouched the common law mirror-image rule for agreements modifying a contract.[25]

The superior court held that both § 2-209 and § 2-207 apply to the issue of contract modification in this case, and we agree. Precedent indicates that under Ohio law, § 2-207 applies to contract formation as well as subsequent contract modification.[26] Nor is Ohio alone in this conclusion; many other jurisdictions agree.[27] The text of § 2-209 supports this conclusion. It does not purport to supplant any other provisions of Article 2; rather, it is best read as providing five *additional* rules that apply to modifications of preexisting contracts, supplementing other applicable rules elsewhere

---

[25]    ConocoPhillips presses this point because, in its view, § 2-209 and common law rules of acceptance would mean that "[e]ven if ConocoPhillips'[s] October 29 letter had assented to all terms of Williams'[s] October 18 letter except the FERC interest term, UCC § 2-209 would still require that the parties *expressly* assent to FERC interest." Because we hold that § 2-207 applies to the contract modification in this case, we do not address what the outcome would be under common law rules of contract formation and modification.

[26]    *See Energy Mktg. Servs., Inc. v. Homer Laughlin China Co.*, 186 F.R.D. 369, 375 (S.D. Ohio 1999) (applying the substantive contract law of Ohio and analyzing under UCC § 2-207 a non-mirroring acceptance of an offer to modify a preexisting contract), *aff'd*, 229 F.3d 1151 (6th Cir. 2000).

[27]    *See, e.g.*, *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 98 (3d Cir. 1991) ("In the absence of evidence demonstrating an express intent to adopt a writing as a final expression of, *or a modification to*, an earlier agreement, we find UCC § 2-207 to provide the appropriate legal rules for determining whether such an intent can be inferred from continuing with the contract after receiving a writing containing additional or different terms." (emphasis added)); *U.S. Surgical Corp. v. Orris, Inc.*, 5 F. Supp. 2d 1201, 1206 (D. Kan. 1998) (same), *aff'd sub nom. U.S. Surgical Corp. v. Lorris, Inc.*, 185 F.3d 885 (Fed. Cir. 1999); *Ariz. Retail Sys., Inc. v. Software Link, Inc.*, 831 F. Supp. 759, 764 (D. Ariz. 1993) (applying § 2-207 and § 2-209 to an attempted contract modification).

in the Code.  Nothing in § 2-209 purports to restrict the application of § 2-207 to contract modifications, nor does anything in § 2-207 indicate that its scope should be restricted to initial contract formation to the exclusion of subsequent contract formations modifying the initial contract.  Therefore, we conclude that § 2-207 may apply alongside § 2-209 to modifications of a preexisting contract, at least under the facts presented in this case.[28]

---

[28]    ConocoPhillips cites no authority for the proposition that § 2-209 displaces § 2-207 and requires that all modifications of preexisting contracts satisfy the old common law mirror-image rule.  Those cases that ConocoPhillips does cite do not address this issue but rather establish a distinct proposition: because all modifications (like all contracts) require mutual assent, unilateral modification of a preexisting contract is impossible and mere silence in the face of an offer to modify a contract is ineffective to convey acceptance of the offered modification. *See U.S. Surgical Corp.*, 5 F. Supp. 2d at 1206 (when seller attached a label to the packaging of surgical equipment purporting to limit the customer to a single use of the equipment the buyer had already purchased pursuant to contract, no contract modification occurred simply by performing the original agreement and opening the package); *Ariz. Retail Sys., Inc.*, 831 F. Supp. at 764 (when seller attached a shrink-wrap license to software packaging that buyer had already contracted to purchase, merely opening the package and continuing to perform the original contract did not function as a modification for lack of mutual assent)*; Wachter Mgmt. Co. v. Dexter & Chaney, Inc.*, 144 P.3d 747, 752-55 (Kan. 2006) (same); *Jones v. Best*, 950 P.2d 1, 5 (Wash. 1998) (when a realtor and seller of real property had a preexisting contract for realty services, the realtor's proposed modification to his commission did not effect a modification because the seller's silence to the proposal did not manifest mutual assent); *Alaska Pac. Trading Co. v. Eagon Forest Prods., Inc.*, 933 P.2d 417, 420 (Wash. App. 1997) (when seller sent a proposal for modification of preexisting contract to buyer and buyer did not respond, no contract modification occurred because modification requires mutual assent).  These cases do not establish what *type* of mutual assent is required to effectuate a contract modification — mirror-image acceptance as under the common law or something less as permitted by § 2-207(1). Accordingly, ConocoPhillips's unsupported assertion that § 2-209 displaces § 2-207 with regard to contract modification does not affect our conclusion to the contrary, which is supported by the case law of Ohio and other jurisdictions as well as a commonsense reading of the statute.

### 3.    The additional requirement of § 2-209(2) for a signed writing to modify the Exchange Agreement was satisfied or waived.

ConocoPhillips argues that even if § 2-207 applies in this case, no agreement could have been reached to modify the Exchange Agreement because the negotiations in October 2002 did not comply with the signed-writing requirement of the Exchange Contract as made enforceable by § 2-209(2). Section 2-209(2) states that "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded,"[29] and the Exchange Agreement specifies that "[n]o changes, alterations, or modifications . . . of the Agreement shall be effective unless agreed to in writing by an authorized representative of the Parties." The superior court concluded that the signed-writing requirement was satisfied in this case because "the parties communicated their offers by signed letters" or, in the alternative, because ConocoPhillips's actions in accepting and retaining the $31 million and behaving "as if a contract had in fact been formed" constituted a waiver of the signed-writing requirement as permitted by § 2-209(4).[30] We agree.

ConocoPhillips argues that a signed writing within the meaning of § 2-209 must include express assent to all proposed terms and that ConocoPhillips never explicitly agreed to FERC interest. But nothing in § 2-209 indicates that a signed writing must include express assent to all proposals, and we have already concluded that § 2-209's requirements are additions to other Article 2 rules such as those in § 2-207.

---

[29]    OHIO REV. CODE ANN. § 1302.12(B) (West 2013) (codifying U.C.C. § 2-209(2)).

[30]    *Id.* § 1302.12(D) (codifying U.C.C. § 2-209(4)) ("Although an attempt at modification . . . does not satisfy the [signed-writing] requirement[] of [subsection (2)] . . . it can operate as a waiver.").

The signed-writing requirement of § 2-209(2) is not a back-door route to reintroduce the common law requirements that are modified by § 2-207.

ConocoPhillips also argues that its October 2002 correspondence could not be found to waive the signed-writing clause, citing *Saydell v. Geppetto's Pizza & Ribs Franchise Systems, Inc.*[31] But, as relevant here, that case indicates only that the delay of a franchisee in requesting the return of his franchise fee from the franchisor will not be held as a waiver of his right to recover the fee under the franchise contract at a later date.[32] Moreover, that case rests on the common law of contract rather than the UCC.[33] We agree with ConocoPhillips that waiver under § 2-209(4) may be accomplished only through affirmative statements or actions indicating intent to waive and not merely by silence or inaction of ambiguous import, but we also agree with the superior court that ConocoPhillips's actions and statements in this case could be construed as a matter of law only as indicating waiver of a signed-writing requirement. The following facts are decisive on this matter: ConocoPhillips's characterization of the payment as a "preliminary partial settlement" of the dispute over the Exchange Agreement's pricing provision, ConocoPhillips's use of the "received and retained" language mirroring the mode of acceptance laid down in Williams's offer, and the entire course of conduct following these negotiations in which the parties indicated their belief that the deal was done and that they could move on to other matters.

---

[31] 652 N.E.2d 218, 225-26 (Ohio App. 1994).

[32] *Id.*

[33] *Id.*

**B.** **The Superior Court Did Not Err In Its Initial Grant of Summary Judgment to Williams Under UCC § 2-207(1) And Should Not Have Rescinded Its Order As Improvidently Granted.**

At common law, a contract could be formed only if the acceptance were a "mirror image" of the offer, replicating all of the terms of the offer without adding conflicting or additional terms.[34] Bowing to the "modern realities of commerce" in which parties exchange non-mirroring writings and nonetheless proceed as if the deal is done, the UCC abrogated the mirror-image rule and replaced it with the provisions of UCC § 2-207.[35] UCC § 2-207(1) permits contract formation whenever "[a] definite and seasonable expression of acceptance . . . is sent within a reasonable time . . . even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."[36] The purpose of UCC § 2-207(1) is to bring commercial practice and legal doctrine closer together: "Under this Article . . . a proposed deal which in commercial understanding has in fact been closed is recognized as a contract."[37]

When a contract is formed under UCC § 2-207(1), the terms of that contract generally include all of the offeror's terms "which are not contradicted by the

---

[34] RESTATEMENT (SECOND) OF CONTRACTS § 59 (1981); 1 WHITE, SUMMERS & HILLMAN, *supra* note 22, § 2:9, at 79.

[35] 1 WHITE, SUMMERS & HILLMAN, *supra* note 22, § 2:9, at 79. *See also* OHIO REV. CODE ANN. § 1302.10 cmt. 1 (replicating U.C.C. § 2-207 cmt. 1) (indicating that this section was "intended to deal with" a situation in which "the seller's form contains terms different from or additional to those set forth in the buyer's form"); *Idaho Power Co. v. Westinghouse Elec. Corp.*, 596 F.2d 924, 926 (9th Cir. 1979) ("Section 207 . . . rejects the 'mirror image' rule, and converts a common law counteroffer into an acceptance even though it states additional or different terms.").

[36] OHIO REV. CODE ANN. § 1302.10(A) (West 2013).

[37] *Id.* cmt. 2 (replicating U.C.C. § 2-207 cmt. 2).

acceptance."[38] The "additional terms" found in the acceptance "are to be construed as proposals for addition to the contract."[39] UCC § 2-207(2) governs the conditions under which those proposals for additional terms become part of the contract: When the contracting parties are merchants,[40] "the terms become part of the contract unless one of the following applies: (1) The offer expressly limits acceptance to the terms of the offer. (2) They materially alter it. (3) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received."[41]

The superior court initially granted Williams's motion for summary judgment on the grounds that ConocoPhillips's letter of October 29 was a "definite and seasonable expression of acceptance" of the offer contained in Williams's letter of October 18, within the meaning of UCC § 2-207(1), and that the contract that formed included a term for FERC interest.[42] On reconsideration, the superior court concluded

---

[38]    1 WHITE, SUMMERS & HILLMAN, *supra* note 22, § 2:11, at 89; *see also id.* at 89 n.1 (collecting cases).

[39]    OHIO REV. CODE ANN. § 1302.10(B) (codifying U.C.C. § 2-207(2)).

[40]    OHIO REV. CODE ANN. § 1302.01(A)(5) (codifying U.C.C. § 2-104(1)) (" 'Merchant' means a person who deals in goods of the kind or otherwise by the person's occupation holds the person out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . .").

[41]    *Id.* § 1302.10(B) (codifying U.C.C. § 2-207(2)).

[42]    The superior court's conclusion depended on six important facts, as summarized in its order on motion for reconsideration:

1.    Contrary to Conoco's litigation position, Conoco's October 29 letter failed to state it was a rejection of and counteroffer to Williams's October 18 offer.

2.    Conoco affirmatively indicated receipt and

(continued...)

that "it should not have ruled summarily that Conoco's letter of October 29, 2002 was a 'definite and seasonable expression of acceptance,' given Conoco's express rejection of Williams's joint-negotiating provision. The court's characterization of Williams's term as non-material constitutes a disputable inference, which defeats summary judgment." We conclude that the superior court correctly granted summary judgment to Williams on the grounds that ConocoPhillips's letter of October 29 was a definite and

---

[42](...continued)
retention of the wire transfer, quoting Williams's specified means of acceptance.

3.      Conoco stated that while it did not agree with all of Williams's proposed terms, no further negotiation was necessary. It thereby reasonably communicated its acceptance of all but the explicitly rejected joint-negotiation provision in the Williams counteroffer.

4.      Conoco explicitly stated that it "received and retained the payment as a preliminary partial settlement" of Williams's contingent liability in the FERC proceeding. By this rhetoric, Conoco suggested that the matter was settled. This would only occur if Conoco accepted Williams's counteroffer.

5.      Conoco stated no objection to Williams's interest provision. Conoco had previously proposed that the payment would accrue interest in its initial offer on October 17.

6.      Conoco closed its letter by indicating satisfaction with Williams's proffered assurance and agreeing to continue to honor the exchange agreement, thereby lifting its threat to cease deliveries of crude oil to Williams's refinery. This language is inconsistent with a call for further negotiation.

seasonable expression of acceptance under § 2-207(1), and that its order on reconsideration was an understandable error resulting from an overabundance of caution.

1.     **Under UCC § 2-207(1), ConocoPhillips's reply letter of October 29 was a definite and seasonable acceptance leading to contract formation.**

The superior court correctly held in its grant of summary judgment that ConocoPhillips's letter of October 29[43] was a "definite and seasonable expression of acceptance" of the offer made in Williams's letter of October 18, within the meaning of UCC § 2-207(1). In that letter, ConocoPhillips acknowledged that it had "received and retained the Payment as a preliminary partial settlement" of the disagreement over the pricing provision of the oil exchange contract, mirroring the language Williams used in its letter of October 18 specifying the mode of acceptance of its offer: "ConocoPhillips'[s] receipt and retention of the [money] . . . shall constitute ConocoPhillips'[s] agreement with the terms set forth in . . . this letter." ConocoPhillips did not state that its letter was a rejection of and counteroffer to Williams's offer of October 18 but rather indicated that the dispute over the pricing provision of the Exchange Agreement was now settled and that no further negotiation was necessary to close the deal. ConocoPhillips agreed to continue to honor the Exchange Agreement,

---

[43]     We note that ConocoPhillips also sent a reply email on October 18 following receipt of the wire transfer and Williams's letter specifying the terms of the offer, in which ConocoPhillips acknowledged receipt and concluded that it could "now focus [its] efforts on getting [the FERC rate-making case] settled." We do not reach the issue of which reply led to contract formation under § 2-207(1): the email of October 18 or the subsequent letter of October 29. We follow the influential and persuasive authority of other jurisdictions in deciding that "[w]e see no need to parse the parties's [sic] various actions to decide exactly when the parties formed a contract" under § 2-207(1). *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 98 (3d Cir. 1991). Rather, the content of both documents informs the analysis and drives our conclusion that a contract was formed under § 2-207(1).

thus lifting the threat to halt crude oil deliveries and indicating satisfaction with Williams's assurance. Finally, ConocoPhillips closed the letter by indicating that the matter was settled and the parties could move on with their regular business: "ConocoPhillips looks forward to continuing to work with Williams under the parties' various agreements."[44] All of these facts indicate that ConocoPhillips gave Williams a definite and seasonable expression of acceptance of its offer of October 18.

Our conclusion is not altered by the fact that ConocoPhillips's letter of October 29 seemed to object to the joint-negotiating provision,[45] as well as vaguely hint that "ConocoPhillips does not agree with all of the terms stated in your letter." The

---

[44]     That ConocoPhillips considered the matter settled as per the October 18 letter is further supported by an email sent from ConocoPhillips to Williams on October 18: "We received your letter and our treasury guys just confirmed receipt of the funds. We can now focus our efforts on getting [the] Quality Bank [rate-making case] settled."

[45]     For the purposes of this analysis, we assume arguendo that ConocoPhillips actually rejected Williams's joint-negotiating term. However, on this record, that is far from certain. Williams had offered as a term in its letter of October 18 that "ConocoPhillips agrees that it will continue good faith efforts to resolve all Quality Bank issues through negotiated settlement and vigorous support of the Eight-Party Joint Defense Position before FERC and the RCA." In its reply letter of October 29, ConocoPhillips stated that it "is continuing 'good faith efforts to resolve all Quality Bank issues through negotiated settlement and vigorous support for the Eight-Party Joint Defense Position before FERC and the RCA,' " but it insisted that this obligation was "[c]ompletely independent of the Payment" and that "[t]here is no linkage whatsoever" between ConocoPhillips demanding adequate assurances and the joint-negotiating position in the rate-making case. We note that the superior court concluded that ConocoPhillips "rejected" the joint-negotiating term and are mindful of the need to make all reasonable inferences in favor of the non-moving party when considering a grant of summary judgment. *Witt v. State, Dep't of Corr.*, 75 P.3d 1030, 1033 (Alaska 2003). But we note that if the best view of the facts were that ConocoPhillips did *not* reject the joint-negotiating provision, our conclusion about contract formation under § 2-207(1) would be even stronger.

UCC makes clear that a "definite and seasonable expression of acceptance" results in contract formation "even though it states terms additional to or different from those offered."[46] Indeed, the entire purpose of UCC § 2-207(1) was to abrogate the common law mirror-image rule and allow for non-mirroring acceptances to nonetheless result in contract formation.[47]

To be sure, there is an outer limit to how much a return letter may differ from an offer and still result in contract formation under § 2-207(1), and the contours of that limit are not entirely clear from the Code, the case law, or treatises. UCC § 2-207(2) presupposes that a return document can be an acceptance under § 2-207(1) even though it includes additional terms that "materially alter[]" the offer,[48] and a respected treatise concludes that "it is clear that a document may be an acceptance . . . and yet differ *substantially* from the offer."[49] A Court of Appeals in Ohio has held in *Alliance Wall Corp. v. Ampat Midwest Corp.* that a return letter does not constitute an acceptance under § 2-207(1) "where the parties disagree as to 'dickered for' terms."[50] The court did not

---

[46]    OHIO REV. CODE ANN. § 1302.10(A) (codifying U.C.C. § 2-207(1)).

[47]    *Id.* § 1302.10 cmt. 1 (replicating U.C.C. § 2-207 cmt. 1) .

[48]    UCC § 2-207(2) governs when additional, non-mirroring terms from a return letter constituting an acceptance under § 2-207(1) will become part of the contract thus formed. UCC § 2-207(2)(b) indicates that, among merchants, non-mirroring terms automatically become part of the contract unless those terms "materially alter" the contract formed under § 2-207(1). *See also* 1 WHITE, SUMMERS & HILLMAN, *supra* note 22, § 2:10, at 83.

[49]    1 WHITE, SUMMERS & HILLMAN, *supra* note 22, § 2:10, at 83 (emphasis added).

[50]    477 N.E.2d 1206, 1211 (Ohio App. 1984). *See also* 1 WHITE, SUMMERS & HILLMAN, *supra* note 22, § 2:17, at 112 ("Not all return documents are 2-207(1) (continued...)

define "dickered-for terms" but cited an example used in the learned treatise:  No contract forms when a purchase order requests a certain amount of a commodity at $0.10 per pound and the acknowledgment proposes $0.15 per pound.[51]  Another example comes from *Alliance Wall* itself, where the court concluded that no contract formed under § 2-207(1) when time was of the essence, the parties did not reach agreement on a delivery date, the delivery date was of utmost importance to each party, and the return document struck the offeror's delivery date and inserted its own.[52]  We conclude based on these authorities that, whatever the precise boundaries of the dickered-for exception to § 2-207(1) acceptance, the return document will qualify for that exception only if it differs *significantly* (not just materially) from the offer on a *sufficiently important* term.[53]

---

[50](...continued)
'acceptances.'  If the return document diverges significantly as to a dickered term, it cannot be a 2-207(1) acceptance.").

[51]    *See* 477 N.E.2d at 1211 n.5; 1 WHITE, SUMMERS & HILLMAN, *supra* note 22, § 2:17, at 112-13.

[52]    477 N.E.2d at 1210.  In that particular case, the delivery date appears to have been a crucial and hotly disputed term throughout negotiations.  Indeed, the delivery date "appears to have been more important to the buyer than was the exact price" and "[t]he seller appeared to be just as adamant not to be bound to any particular date."  *Id.*

[53]    The parties offer competing interpretations of the scope of the dickered-for exception, both of which we reject.

Williams argues that a dickered-for term is one which is "both material and . . . previously negotiated between the parties" and that the joint-negotiating provision cannot qualify because it was not negotiated prior to the October 18 letter.  Not only does Williams not cite any authority for this proposition, but it also conflicts with the established example of a dickered-for term in the *Alliance Wall* case, where the court cited as an example of a dickered-for term a price change that had not previously been disputed by the parties.  *See* 477 N.E.2d at 1211 n.5.

(continued...)

ConocoPhillips's letter of October 29 is clearly outside of those bounds and results in contract formation under § 2-207(1). First, the joint-negotiating provision was not sufficiently important in the context of the overall transaction to stymie § 2-207(1) contract formation. Unlike the delivery date in *Alliance Wall*, the joint-negotiating provision was not of utmost importance to the parties in this case, subjectively or objectively: From an objective perspective, it would be difficult to conclude that a term merely purporting to reaffirm ConocoPhillips's commitment to a preexisting joint-negotiating agreement is important in the context of the overall settlement. Indeed, the

---

[53](...continued)

ConocoPhillips argues that dickered-for terms are defined in opposition to "standard boiler-plate terms" and encompass all those terms "that are unique to each transaction such as price, quality, quantity, or delivery terms as compared to the usual unbargained terms on the reverse side [of a form] concerning remedies, arbitration, and the like[.]" (Alterations in original.) ConocoPhillips argues that "[i]n this case, *all* of the terms in the parties' correspondence were 'dickered for' terms." (Emphasis in original.) But a distinction between front-side terms and reverse-side or boilerplate terms is not useful in this context, where the parties have negotiated every provision of the contract rather than engaging in a traditional battle of the forms. Under ConocoPhillips's theory, § 2-207(1) has no application outside of the boilerplate context. Yet nothing in the text of § 2-207 would limit itself in such a way, and courts have often applied § 2-207 in situations not involving boilerplate forms but rather detailed negotiation among sophisticated parties, on the theory that § 2-207 applies whenever an acceptance does not mirror an offer. *See, e.g.*, *Energy Mktg. Servs., Inc. v. Homer Laughlin China Co.*, 186 F.R.D. 369 (S.D. Ohio 1999) (stating that, as a matter of Ohio contract law, UCC § 2-207(1) applies "when an acceptance differs in terms from an offer," *id.* at 374, including where the parties had negotiated a contract amendment over the course of years, *id.* at 371-73), *aff'd*, 229 F.3d 1151 (6th Cir. 2000). We reject any interpretation of the dickered-for terms exception that would swallow the more general § 2-207(1) rule and bring common law rules in through the back door.

Accordingly, we reject both parties' proffered definitions of the scope of the dickered-for terms exception in favor of our formulation here of the outer bounds of the exception, whatever its precise definition.

relative unimportance of this provision may explain why the parties indicate little subjective interest in the provision. The joint-negotiating term was first introduced into negotiations in Williams's letter of October 18. That the parties considered this provision to be relatively unimportant is confirmed by the parties' actions indicating that, in their minds, the deal was done following acceptance of the payment notwithstanding ConocoPhillips's objections.[54] Second, the degree of change to the contested term proposed by the October 29 acceptance is also relatively small. Unlike the 50% increase in price in the treatise hypothetical cited in *Alliance Wall*, there is relatively little distance between the offer to reinscribe a preexisting, independent agreement and the return proposal to voluntarily commit to continue performing a preexisting, independent agreement.

Simply put, ConocoPhillips's rejection of Williams's joint-negotiating provision was a relatively unimportant and relatively small discrepancy within the context of the larger deal. The course of negotiation and the parties' post-negotiation behavior indicate that neither party thought the term sufficiently important or the change sufficiently great to require additional negotiation.[55] In short, the parties thought they

---

[54] The superior court concluded that "Conoco accepted the proffered $31 million and behaved as if a contract had in fact been formed."

[55] In addition to ConocoPhillips's purported rejection of the joint-negotiating provision, ConocoPhillips also stated in its letter of October 29 that it "d[id] not agree with all of the terms stated in [Williams's] letter" but that it "also d[id] not believe it would prove productive to conduct a letter writing campaign as to what the Payment represents or specific terms and conditions associated with the Payment." In the words of the superior court in its order on motion for summary judgment, such "seemingly studied ambiguity" hinting at "undisclosed issues with at least one term of Williams'[s] counteroffer" cannot preclude the conclusion that there was a definite and seasonable expression of acceptance in this case. As the superior court properly concluded, "If Conoco perceived no need to further discuss the terms Williams proposed, but elected

(continued...)

were done negotiating, and the purpose of § 2-207(1) is to step in to supply a contract in just such a situation.

Finally, ConocoPhillips garners no help from § 2-207(1)'s narrow exception for acceptances "expressly made conditional on assent to the additional or different terms." That exception "has been construed narrowly" by courts[56] to apply "only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms therein."[57] Here, ConocoPhillips failed to state explicitly in its letter of October 29

---

[55](...continued)
to retain the $31 million, the reasonable implication is that Conoco grudgingly but definitively assented to the Williams terms, except those explicitly rejected." Vague hints of disagreement combined with acceptance of payment in the form prescribed by the offer and explicit disagreement with one term cannot be allowed to convert an otherwise-definite expression of acceptance into an ineffective counteroffer. To hold to the contrary would be to undermine the guiding principle of interpretation of UCC § 2-207: preventing one party from obtaining an "unearned advantage." *See* 1 WHITE, SUMMERS & HILLMAN, *supra* note 22, § 2:9, at 81. In order for objections in a return letter to foreclose contract formation under § 2-207(1), those objections must be sufficiently explicit as to which provisions they pertain to, or sufficiently clear as to the respondent's intent to reject the offer in general. *See id.* § 2:11, at 89 (arguing that silence in a § 2-207(1) acceptance as to a term in the offer constitutes grudging acceptance of that term); *id.* at 89 n.1 (collecting cases). Here, ConocoPhillips never characterized its letter of October 29 as a rejection in general, and the only specific term it registered disagreement with was the joint-negotiating provision. Accordingly, its exercise in studied ambiguity cannot succeed where its more specific objections failed. As the superior court correctly concluded, "Conoco grudgingly but definitively assented to the Williams terms, except those explicitly rejected."

[56] *Idaho Power Co. v. Westinghouse Elec. Corp.*, 596 F.2d 924, 926 (9th Cir. 1979).

[57] *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1168 (6th Cir. 1972). Indeed, such a narrow interpretation is required by the nature of UCC § 2-207(1) as
(continued...)

that its acceptance was conditioned on Williams's assent to the omission of the joint-negotiating provision from the contract. ConocoPhillips instead appeared eager to proceed with the transaction as concluded and move on to address other issues. As ConocoPhillips told Williams in an email after receiving the $31 million transfer, "We can now focus our efforts on getting [the Quality Bank rate-making case] settled."

Accordingly, we conclude that the superior court's initial grant of summary judgment in favor of Williams under UCC § 2-207(1) was proper.

### 2. The terms of the resulting contract included a provision to credit the $31 million prepayment with interest at the FERC rate.

When a contract is formed under UCC § 2-207(1), the terms of that contract generally include all of the offeror's terms "which are not contradicted by the acceptance."[58] We have previously held that an offeree's failure to "manifest any objection to the terms" of an offer or to "mak[e] its acceptance of the offer conditional on [the offeror's] assent to different terms" results in the offeror's terms "be[coming] part of the contract."[59] This position is amply supported by persuasive authority in other jurisdictions.[60] It is true that in response to *an entire offer*, mere silence or inaction

---

[57](...continued)
abrogating the mirror-image rule of the common law: If non-mirroring acceptances were construed too liberally as being conditioned on the assent of the offeror, the rigidity of the mirror-image rule would re-enter the Code through the back door of an exception to § 2-207(1).

[58]     1 WHITE, SUMMERS & HILLMAN, *supra* note 22, § 2:11, at 89; *see also id.* at 89 n.1 (collecting cases).

[59]     *Armco Steel Corp. v. Isaacson Structural Steel Co.*, 611 P.2d 507, 518 (Alaska 1980).

[60]     *See, e.g.*, *Constr. Aggregates Corp. v. Hewitt-Robins, Inc.*, 404 F.2d 505,

(continued...)

generally do not indicate assent.[61]  But silence *as to one term*, coupled with assent to the offer *as a whole*, cannot defeat inclusion of that term in the resulting contract.

The superior court's order on summary judgment correctly concluded that, on the facts of this case, ConocoPhillips's acceptance of October 29 formed a contract under § 2-207(1), the terms of which included a provision to credit Williams with interest on the $31 million principal prepayment at the rate prescribed by the FERC. ConocoPhillips's letter of October 29 was a definite and seasonable expression of acceptance resulting in contract formation.  ConocoPhillips indicated that no further negotiation was necessary, thereby communicating acceptance of all but the explicitly rejected terms.  ConocoPhillips did not object to Williams's provision specifying that the principal would accrue interest at the FERC rate but rather objected only to the joint-negotiating provision.   Moreover, ConocoPhillips had already proposed that the prepayment would accrue interest (at the LIBOR rate) on October 17, so as a matter of law its silence as to Williams's counteroffer of October 18 for FERC interest constitutes assent to Williams's proposal.  Finally, as the superior court correctly noted, "[t]he demand for FERC interest was not an implausible overreach" but rather was a reasonable proposal in light of the deal, such that its inclusion in the resulting contract is proper.[62]

---

[60](...continued)
510 (7th Cir. 1968) (concluding that offeror "could reasonably have assumed that [offeree's] single objection was an acquiescence in the remaining terms of the counter-offer"); *Earl M. Jorgensen Co. v. Mark Const., Inc.*, 540 P.2d 978, 983 (Haw. 1975) (holding that "silence was not an effective rejection or a counteroffer" when an offer included a specific provision and the response otherwise indicated assent but omitted reference to the provision).

[61]      *See supra* note 28.

[62]      ConocoPhillips disagrees and argues that it would be unfair to credit
(continued...)

We conclude that the contract formed by ConocoPhillips's acceptance includes a term for FERC interest.

> **3. The superior court was correct in its first entry of summary judgment, and thus it should not have rescinded its initial order as improvidently granted.**

After granting Williams's motion for summary judgment and concluding that a contract for FERC interest was formed under § 2-207(1), the superior court granted ConocoPhillips's motion for reconsideration and ordered additional briefing on the UCC § 2-207 issues because the parties had not briefed them before. ConocoPhillips

---

[62](...continued)
interest at the administratively prescribed FERC rate rather than the "market rate" of LIBOR. ConocoPhillips argues that LIBOR is inherently fair because "[h]ad the parties proceeded on this basis, neither party would have gained or lost value" because "Williams would have lost the time value of its $31 million, but it would have received interest at a market rate from ConocoPhillips to make up for that time value loss." ConocoPhillips confuses the issue by hypothesizing a single market rate of interest and thus attempts to make Williams's demand for FERC interest seem unreasonable. But it is axiomatic that there is no single "market rate" of interest; rather, market rates of return depend on *which* market the investor chooses to enter and the concomitant risk the investor chooses to assume. *See, e.g.*, Edwin J. Elton & Martin J. Gruber, *Modern Portfolio Theory, 1950 to Date*, 21 J. BANKING & FIN. 1743, 1744 (1997). If Williams knew it would be responsible for the higher FERC interest rate on retroactively assessed Quality Bank degradation charges, then it would be reasonable for Williams to attempt to earn FERC rates of interest on the principal it set aside for such charges by purchasing assets in a market with correspondingly high levels of risk and return. Accordingly, it might be reasonable for Williams to insist when it transferred ownership of the principal corpus to ConocoPhillips that ConocoPhillips agree to credit Williams with the FERC rate of interest Williams would have otherwise attempted to earn for itself. Indeed, in oral argument, counsel for Williams stated that this was precisely the rationale behind Williams's proposal for FERC interest. Thus, LIBOR interest is not the only " 'break even' point" in the transaction, ConocoPhillips's assertions to the contrary notwithstanding. Rather, the prospective time-value of money is an endogenous variable susceptible to influence by the actions of the person making investment decisions.

argued: (1) its letter of October 29 was not a definite and seasonable expression of acceptance within the meaning of § 2-207(1); (2) a contract under § 2-207(3) was formed in the course of performance but only for retention of the transferred money; (3) no agreement was reached for interest; and (4) the gap-filling interest provision of UCC § 9-207(3), which does not mandate accrual of interest on cash collateral obtained in a security transaction, governs this case. Williams supported the original grant of summary judgment.

On reconsideration, the court concluded that it had improvidently granted summary judgment because "it should not have ruled summarily that Conoco's letter of October 29, 2002 was a 'definite and seasonable expression of acceptance,' given Conoco's express rejection of Williams's joint-negotiating provision. The court's characterization of Williams's term as non-material constitutes a disputable inference, which defeats summary judgment."[63]

We conclude that the superior court correctly granted Williams summary judgment the first time around and erred in concluding on reconsideration that it had

[63] As an additional reason favoring its reconsideration of the grant of summary judgment, the superior court stated that its "characterization of Conoco's rejection of the joint-negotiating term . . . fits awkwardly within the actual wording of UCC section 2-207(B) [sic], which speaks of *additional* terms being construed as 'proposals for addition to the contract.' " (Emphasis in original.) The superior court's concerns were inapposite to the question before the court. UCC § 2-207(1) and (2) address two distinct issues: (1) addresses the issue of contract formation, while (2) addresses the issue of which additional terms from the non-mirroring acceptance come into the new contract. The § 2-207(2) question in this case — whether ConocoPhillips's apparent rejection of the joint-negotiating provision would cause that provision to fall out of the contract formed under § 2-207(1) or whether, in the alternative, the rejection of a term in the offer cannot be effective under § 2-207(2) because that section addresses only "additional" terms — has no bearing on the § 2-207(1) question in this case — whether the October 29 letter constitutes a definite expression of acceptance of Williams's October 18 offer.

improvidently granted summary judgment.[64]  As we have already noted, the superior court's error was understandable, resulting from an abundance of caution.  This is a complex case.  But as we concluded in section IV.B.1 above, ConocoPhillips's rejection of Williams's joint-negotiating provision was neither a sufficiently large change in that provision nor a sufficiently important part of the overall bargain to vitiate contract formation under § 2-207(1).  That conclusion of law is not a disputable inference of fact that could foreclose summary judgment.[65]  Indeed, the parties do not dispute any material issues of fact, as the superior court correctly noted in its initial order granting Williams summary judgment.  The only remaining disputes were about the legal conclusions to be drawn from those facts.  Accordingly, we hold that the superior court's order rescinding summary judgment as improvidently granted was error.  We reverse that order and affirm the initial order granting summary judgment on the basis of UCC § 2-207(1).[66]

---

[64]    Because we conclude that a contract for FERC interest was created in October 2002 under UCC § 2-207(1), we decline to reach other issues raised on appeal, including whether a contract for FERC interest was reached under § 2-207(3) and whether or at what rate Williams is owed interest on a theory of quantum meruit.

[65]    To the extent that the superior court was under the impression that a reply letter containing a mere "material" change to the contract could prevent contract formation under § 2-207(1),  the court erred.  UCC § 2-207(2)'s provisions governing which non-mirroring terms enter a contract formed under § 2-207(1) make clear that a materially different term in the reply letter can nonetheless result in contract formation.  *See* OHIO REV. CODE ANN. § 1302.10(B)(2) (West 2013) (codifying U.C.C. § 2-207(2)(b)) (stating that, when the parties to a contract formed by acceptance under § 2-207(1) are merchants, non-mirroring terms in an acceptance do not automatically become part of the resulting contract where those terms "materially alter" the offer).

[66]    We ordinarily do not review denials of motions for summary judgment after a trial on the merits, "at least when the 'motions are denied on the basis that there are genuine issues of material fact.' " *Larson v. Benediktsson*, 152 P.3d 1159, 1169 (Alaska 2007) (quoting *Ondrusek v. Murphy*, 120 P.3d 1053, 1056 n.2 (Alaska 2005)).  We have

(continued...)

**C.    The Superior Court Did Not Abuse Its Discretion By Granting Attorney's Fees And Court Costs To Williams.**

ConocoPhillips and Williams agreed in a Dispute Resolution Agreement at the outset of litigation in 2007 that the "prevailing Party . . . shall be entitled to recover reasonable attorney fees and court costs" to be "paid within twenty (20) days after receipt of an invoice for such costs containing documentation reasonably supporting the amounts."  Both parties agree that Williams is the prevailing party in this litigation because Williams "obtained the relief it sought."  But ConocoPhillips argues that the superior court abused its discretion by granting Williams's motion for leave to enlarge time to file a motion for attorney's fees, extending the time to file a cost bill with the Clerk of Court, and awarding full attorney's fees to Williams while rejecting ConocoPhillips's suggested reductions.  We affirm the superior court's actions with regard to attorney's fees and court costs in all respects.

---

[66](...continued)

reviewed denials of summary judgment after a trial on the merits when the order was entered on a legal ground that affected the subsequent trial.  *Id.* at 1169 (citing *W. Pioneer, Inc. v. Harbor Enters., Inc.*, 818 P.2d 654, 658 (Alaska 1991)).  But the situation before the court today is entirely different.  Rather than seeking to roll back the tape to summary judgment after having proceeded through trial to resolve disputed facts, Williams seeks merely to roll back the tape to the initial grant of summary judgment under § 2-207(1) after we find that the order on reconsideration was error as a matter of law.  Neither *Larson* nor any other precedent of this court prevents us from reviewing a prior motion for summary judgment in this procedural context.  Indeed, *Larson* and *Western Pioneer* support the proposition that review in this context is proper because the error in the order on reconsideration was a legal error.

### 1. The superior court did not abuse its discretion by granting Williams additional time to file its motion for attorney's fees.

Under Alaska Civil Rule 82, in order to recover an "award of attorney's fees . . . pursuant to contract," the prevailing party must file a motion "within 10 days after the date shown in the clerk's certificate of distribution on the judgment" or within "such additional time as the court may allow."[67] Failure to file a timely motion "shall be construed as a waiver of the party's right to recover attorney's fees."[68] Alaska Civil Rule 6(b) further specifies that, where the Alaska Civil Rules require an act "be done at or within a specified time, the court for cause shown may at any time in its discretion . . . upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect."[69] Finally, Alaska Civil Rule 94 provides that the Civil Rules "are designed to facilitate business and advance justice" and they "may be relaxed or dispensed with by the court in any case where it shall be manifest to the court that a strict adherence to them will work injustice."[70]

In this case, the clerk's certificate of distribution on the final judgment shows the date February 9, 2012, and the ten-day period for Williams to file a motion for costs and attorney's fees ended on February 20 or 22, 2012.[71] Williams did not file

---

[67]  Alaska R. Civ. P. 82(c).

[68]  *Id.*

[69]  Alaska R. Civ. P. 6(b).

[70]  Alaska R. Civ. P. 94.

[71]  The parties disagree as to when the ten-day clock ran in this case. Williams argues that it filed its motion to enlarge time to file a motion for attorney's fees "eight days after it was due" on March 1, implying that the clock would have run on February 22. (2012 was a leap year.) ConocoPhillips argues that Williams's motion was

(continued...)

within that period. On March 1 Williams filed a motion for leave to enlarge time to file a motion for attorney's fees, asking the court to accept an attached motion for $469,331.68 in attorney's fees and several exhibits. Williams argued that its failure to meet the ten-day deadline was the result of excusable neglect under Rule 6(b) because it did not know that Rule 82's requirements would apply to its motion for attorney's fees under the Dispute Resolution Agreement. Williams further argued that the delay "does not impact the judicial proceedings in this case and it does not prejudice ConocoPhillips." ConocoPhillips argued that an attorney's mistake as to the applicable rules in this context cannot constitute excusable neglect.

The superior court granted Williams's motion to enlarge time to file a motion for attorney's fees, finding "excusable neglect and no prejudice." The superior court explained that "[t]he court was inartful" in its Final Judgment, in which the court stated that "Williams may move the Court for an award of attorney fees" as the "prevailing party . . . pursuant to . . . the parties' Dispute Resolution Agreement." The superior court explained that it "should also have struck the 'pursuant to' . . . clause, because the attorney fee entitlement is pursuant to ARCP 82."

On appeal, ConocoPhillips argues that the superior court abused its discretion when it "took the blame for Williams'[s] failure to timely file its motion." ConocoPhillips reasoned that there was no excusable neglect for the late motion because Rule 82(c)'s applicability to contract-based fee motions was clear on the face of the Rule and that nothing in the superior court's final judgment created ambiguity on that issue.

---

[71](...continued)
due by Monday, February 20, 2012 and that its motion was ten days late. Neither party adequately explains the legal theory underlying these assertions. But we conclude that the two-day difference between being late by eight days (Williams's theory) and being late by ten days (ConocoPhillips's theory) would not change the outcome of our holding in this case.

ConocoPhillips also reasoned that the mere lack of prejudice to ConocoPhillips alone cannot sustain a finding of excusable neglect. We review a trial court's disposition of a motion to enlarge time for abuse of discretion.[72]

We affirm the superior court's order granting Williams's motion to enlarge time to file a motion for attorney's fees. The superior court certainly did not abuse its discretion in this case. The delay of ten days in this case is well within the zone of permissible discretion suggested by our precedent. In *T & G Aviation, Inc. v. Footh*,[73] we held that the superior court did not abuse its discretion by allowing a party to file a motion for attorney's fees 70 days late, even in the absence of a persuasive explanation for the delay.[74] Indeed, when there is no showing of prejudice, it may be an abuse of discretion *not* to allow an untimely motion for attorney's fees on facts such as those presented in this case.[75] In short, Williams's neglect in failing to recognize the applicability of Rule 82(c)'s deadlines is "that type of excusable inadvertence or neglect

---

[72]     *State v. 1.163 Acres, More or Less, Chuckwm, Inc.*, 449 P.2d 776, 779 (Alaska 1968); *see also Worland v. Worland*, 193 P.3d 735, 742 (Alaska 2008) (quoting *Estate of Lampert Through Thurston v. Estate of Lampert Through Stauffer*, 896 P.2d 214, 218 (Alaska 1995)) (holding that the "authority to enlarge the time allowable for an act pursuant to Rule 6(b) is a function addressed to the sound discretion of the trial court").

[73]     792 P.2d 671 (Alaska 1990) (per curiam).

[74]     *Id.* at 672; *see also Alderman v. Iditarod Props., Inc.*, 32 P.3d 373, 397 (Alaska 2001) (holding it was not an abuse of discretion to allow a motion for attorney's fees filed 70 days late where there was no showing of prejudice).

[75]     *See Conger v. Conger*, 950 P.2d 119, 122-23 (Alaska 1997) (directing superior court to accept late-filed opposition to custody modification where delay was caused by a miscalculation of the due date).

common to all who share the ordinary frailties of [hu]mankind,"[76] and the superior court did not abuse its discretion by granting Williams's motion to enlarge time to file a motion for attorney's fees.

> **2.    The superior court did not abuse its discretion by granting Williams additional time to file its motion for court costs.**

Alaska Civil Rule 79(b) requires[77] a prevailing party seeking to recover costs to "file and serve an itemized and verified cost bill, showing the date costs were incurred, within 10 days after the date shown in the clerk's certificate of distribution on the judgment . . . or such additional time as the court may allow." The rule further specifies that "[f]ailure of a party to file and serve a cost bill . . . will be construed as a waiver of the party's right to recover costs."[78]  Just as discussed previously with regard to Rule 82(c) motions for attorney's fees, Rules 6(b) and 94 provide further discretionary

---

[76]    *Id.* at 122 (quoting *Jenkins v. Arnold*, 573 P.2d 1013, 1016 (Kan. 1978)).

[77]    We assume without deciding that Civil Rule 79(b) applies in this case, even though court costs were sought pursuant to contractual entitlement rather than Rule 79 itself.  ConocoPhillips and Williams both couch their arguments as if Rule 79(b) provided the relevant deadlines for filing a cost bill.  But we note sua sponte that Rule 79(b), unlike Rule 82(c), does not purport to require a cost bill filing for an award of court costs "under this rule or pursuant to contract." Alaska R. Civ. P. 82(c).  Rather than purporting to apply specifically to contract-based awards of court costs, Rule 79(b) states flatly that "[t]o recover costs, the prevailing party must file and serve an itemized and verified cost bill . . . within 10 days." Alaska R. Civ. P. 79(b).  Whether Rule 79 applies to contractual court-cost awards, or whether its rules should apply only by analogy or by the adoption and stipulation of the parties, we leave for another day when that issue is presented to the court squarely.  We hold today that, even if Rule 79's requirements apply in full force in this case, the superior court did not abuse its discretion in granting leave to Williams to file its cost bill late.

[78]    Alaska R. Civ. P. 79(b).

flexibility on a showing of excusable neglect or when a strict adherence to the ten-day limit would "work injustice."[79]

Eight to ten days after it would have been due under Rule 79(b)'s ten-day period,[80] Williams filed a motion for leave to enlarge the time to file its motion for attorney's fees on March 1, 2012. Although this motion did not mention Civil Rule 79 by name, it clearly indicated that Williams was seeking compensation for court costs. Specifically, that motion mentioned the difficulty Williams experienced assessing fees and costs; included a costs calculation of $10,489.05 as an exhibit attached to the motion; included a section for the clerk's ruling on the cost bill and a separate line for "recoverable costs" of $10,489.05 in the attached motion for attorney's fees; and it concluded the motion for attorney's fees by asking for "$479,819.73 as reasonable attorney fees and court costs." ConocoPhillips argued that Williams had waived any right to costs because "[c]ost bills are considered by the clerk pursuant to a separate procedure, . . . and Williams may not 'piggyback' an untimely cost bill onto its attempt to file an untimely fee motion." The superior court granted Williams's motion for leave to enlarge time to file a motion for attorney's fees and also "deemed filed" the motion for attorney's fees as well as "exhibits supporting [Williams's motion for attorney's fees]," which included the cost bill.

---

[79] Rule 6(b) provides that, where the Alaska Civil Rules require an act "be done at or within a specified time, the court for cause shown may at any time in its discretion . . . upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect." Alaska R. Civ. P. 6(b). Rule 94 provides that the Civil Rules "are designed to facilitate business and advance justice" and they "may be relaxed or dispensed with by the court in any case where it shall be manifest to the court that a strict adherence to them will work injustice." Alaska R. Civ. P. 94.

[80] *See supra* note 71.

Six months later, and eight months following the expiration of the ten-day period under Rule 79, the superior court ruled on Williams's motion for attorney's fees and awarded Williams full attorney's fees. In that order, the court also noted that "Williams should submit its cost bill to the Clerk of Court for a reasonableness review." ConocoPhillips objected that "[t]his *sua sponte* grant of an 8-month extension of time was improper" because Williams had never requested it and because Williams did not show excusable neglect. The Clerk of Court granted $6,441.70 in court costs to Williams, and the superior court rejected ConocoPhillips's motion for review of cost award. The superior court's final judgment on attorney's fees and costs included $6,441.70 of court costs.

ConocoPhillips argues that the superior court abused its discretion when it granted Williams an extension of time to file its cost bill. ConocoPhillips reasons that Rule 6(b) allows extension after the time period lapses only " 'upon motion' establishing that 'the failure to act was the result of excusable neglect.' " Under its view, neither condition was met here because the court awarded an extension sua sponte and because there was no showing of excusable neglect for such a long delay. Williams argues that it sought an extension of the Rule 79 deadline by including costs in its motion for leave to enlarge time to file a motion for attorney's fees and that this same motion showed excusable neglect. It argues that the superior court "deemed filed" its cost bill, as an attached exhibit, when it granted its motion for leave to enlarge time for filing a motion for attorney's fees, and that the court's subsequent invitation to file its cost bill with the Clerk of Court was within the court's discretionary authority.

We conclude that the superior court did not abuse its discretion in granting Williams leave to file a late cost bill with the Clerk of Court. In *Vazquez v. Campbell*,[81] we confronted a situation in which the prevailing plaintiff timely filed a sufficiently detailed cost bill, not as a cost bill presented to the Clerk of Court as required by Rule 79(b), but rather as a motion to the superior court.[82] We held that the prevailing party had "substantially complied with the requirements of rule 79" because "[i]f the superior court had wished, it could have referred the question of costs to the clerk for an initial decision."[83] Unlike in *Vazquez*, Williams did not timely file its motion for court costs under Rule 79(b) (instead, it filed its cost bill with the Clerk of Court eight months late), and it is unclear on this record whether its cost accounting associated with its motion for leave to enlarge time to file a motion for attorney's fees was sufficiently detailed to meet the requirements of Rule 79. Nevertheless, we conclude that the superior court did not abuse its discretion in granting an extension to Williams to file its cost bill with the Clerk of Court. ConocoPhillips does not argue that it was prejudiced by the delay.[84] It had a chance to object when the final cost bill was submitted, and it even succeeded in reducing the bill significantly. In this case, because of the lack of prejudice and because the motion for leave to enlarge time to file a motion for attorney's

---

[81]    146 P.3d 1 (Alaska 2006).

[82]    *Id.* at 2.

[83]    *Id.* at 2-3.

[84]    This distinguishes this case from *Pruitt v. State, Department of Public Safety, Division of Motor Vehicles*, 825 P.2d 887 (Alaska 1992), in which we held that "the state's motion for attorney's fees, filed seven months after final judgment has been entered, was not filed within a 'reasonable time.' " *Id.* at 896. Our holding in that case was influenced by the finding that the non-prevailing party "was prejudiced by the state's delay." *Id.*

fees had objective indications on its face that Williams was also seeking an extension of time to seek court costs, we conclude that the superior court did not abuse its discretion in granting Williams an extension of the Rule 79(b) deadline.

### 3. The superior court did not abuse its discretion by refusing to reduce the award of attorney's fees.

This court reviews an award of attorney's fees for an abuse of discretion.[85] Under this standard, "[t]he trial court has broad discretion in awarding attorney's fees; this court will not find an abuse of discretion absent a showing that the award was arbitrary, capricious, manifestly unreasonable, or stemmed from improper motive."[86] When evaluating a motion for attorney's fees, "a court should carefully consider all factors relevant to reasonableness."[87] There is no exhaustive list of factors a court may consider to determine whether the attorney's fees claimed are objectively reasonable, but the factors listed in Rule 82(b)(3) may be instructive.[88] Those factors include "the reasonableness of the claims and defenses pursued by each side" and "vexatious or bad

---

[85]     *See Ware v. Ware*, 161 P.3d 1188, 1192 (Alaska 2007) (citing *United Servs. Auto. Ass'n v. Pruitt*, 38 P.3d 528, 531 (Alaska 2001)).

[86]     *Id.* (quoting *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 44 (Alaska 1998)).

[87]     *Krone v. State, Dep't of Health & Soc. Servs.*, 222 P.3d 250, 258 (Alaska 2009).

[88]     *See Valdez Fisheries Dev. Ass'n v. Froines*, 217 P.3d 830, 833 & n.17 (Alaska 2009).

faith conduct."[89] This court reviews "a trial court's fact-based determinations regarding whether attorney's fees are reasonable for an abuse of discretion."[90]

After granting Williams's motion for enlargement of time to file a motion for attorney's fees, the superior court granted Williams's motion for attorney's fees in the full amount of $465,451. As relevant here, ConocoPhillips had argued that the superior court should reduce the attorney's fee award by 50% because Williams's legal arguments had been rejected by the superior court at every stage of litigation. ConocoPhillips also sought an additional reduction for fees spent relative to Williams's (unsuccessful) claim for $30 million in damages resulting from ConocoPhillips's alleged tortious conduct during litigation. The superior court rejected ConocoPhillips's requests for reductions in the award of attorney's fees. The superior court "decline[d] to adjust the fee merely because arguments were ultimately rejected," reasoning that it would be "unfair to reduce the Williams fee by 50 percent, given that it prevailed on the relief it sought" because "the case was very difficult" and "[t]he parties' briefing was high quality and helpful." The superior court noted that "if Williams strayed in its initial briefing, so too did Conoco." The superior court also rejected the request for a reduction in fees relative to the tort claim, reasoning that "[b]oth [parties] adopted aggressive positions," that "[n]either party spent great time or energy on these positions," and that it had already concluded that it would "decline[] to adjust the fee merely because arguments were ultimately rejected." ConocoPhillips raises three primary arguments on appeal.

First, ConocoPhillips argues that the superior court abused its discretion by not reducing the award of attorney's fees in light of the fact that the superior court

---

[89]    Alaska R. Civ. P. 82(b)(3)(F) & (G).

[90]    *Valdez*, 217 P.3d at 832 (citations omitted).

resolved the dispute on different legal grounds than those advanced by the prevailing party. But ConocoPhillips cites no authority for the proposition that such a reduction should be forthcoming simply because the prevailing party advocates a legal position not adopted by the court. Indeed, ConocoPhillips states that this is an issue of first impression in this court. Whether or not this is truly an issue of first impression, we reject ConocoPhillips's proposed rule. Although the superior court ultimately rested its orders on grounds not directly advanced by Williams,[91] the superior court necessarily considered the issues raised in Williams's briefs in making its determinations.[92] And the superior court found that Williams's briefing was of "high quality and helpful." We conclude that the superior court did not abuse its discretion by refusing to reduce an award of attorney's fees when the court rested its orders on legal grounds not advanced by the prevailing party. Fee-shifting contracts and Rule 82 already create ex ante uncertainty about who will bear the ultimate burden of litigation expenses; we are unwilling to create additional uncertainty as to the ultimate size of litigation expenses by telling litigants that they must accurately predict the exact legal basis of the court's holding in order to receive a full award as the prevailing party.

Second, ConocoPhillips argues that the superior court, in stating that "if Williams strayed in its initial briefing, so too did Conoco," abused its discretion by

---

[91] The superior court rested its first grant of summary judgment on UCC § 2-207(1), an issue which Williams had not briefed, and the superior court rested its order on reconsideration on UCC § 2-207(3), even though Williams had supported the original grant of summary judgment under § 2-207(1).

[92] The superior court must have been informed by Williams's initial argument that a contract had been formed under the common law in reaching its conclusion that UCC § 2-207(1) governed the case and displaced the common law, and the superior court necessarily considered Williams's argument on reconsideration that UCC § 2-207(1) governed the case before it held that summary judgment was improvidently granted under § 2-207(1) and instead granted summary judgment under § 2-207(3).

"obligat[ing] the losing party to identify the prevailing party's winning argument." But ConocoPhillips misinterprets the superior court's statement. The superior court did not give ConocoPhillips the burden of identifying the correct legal theory in order to prevail on its motion to reduce the award of attorney's fees for Williams's failure to identify the correct legal theory. Rather, the superior court merely used ConocoPhillips's parallel failure to do so as evidence that the theories advanced by Williams were not unreasonable such that no reduction in attorney's fees would be warranted. Accordingly, we reject ConocoPhillips's argument and conclude that the superior court did not abuse its discretion by relying on such a parallel failure as evidence supporting the reasonableness of the arguments advanced by the prevailing party.

Finally, ConocoPhillips argues that the superior court abused its discretion by refusing to reduce the award of attorney's fees by the amount Williams spent pursuing its unsuccessful tort claim: $14,888.96. ConocoPhillips reasons that its own litigation position (that no contract was formed and no interest credit was due) was reasonable and "*the central issue* in the case" while Williams's tort claim was "utterly unsupportable," such that the superior court made a clearly erroneous factual finding when it characterized both as "aggressive positions" that nonetheless were reasonable in the context of the litigation. (Emphasis in original.) But beyond its bare assertion that "Williams'[s] attempt to recover $30 million . . . was utterly unsupportable," ConocoPhillips does not offer any reason to believe that the tort claim was frivolous or was "not reasonably intended to advance the litigation."[93] We conclude that ConocoPhillips has not met its burden of showing that the superior court's factual finding on this issue was clearly erroneous or that its order refusing to reduce attorney's fees was an abuse of discretion.

---

[93]     *Valdez*, 217 P.3d at 833.

## V.    CONCLUSION

Because the superior court's decision on summary judgment was correct and should not have been rescinded on reconsideration, the initial grant of summary judgment is REINSTATED and AFFIRMED.  Because we conclude that the superior court was right in its initial grant of summary judgment, we do not reach the UCC § 2-207(3) or quantum meruit holdings from its order on reconsideration.  The superior court's rulings on attorney's fees and costs are AFFIRMED.